## DAEWOO ENGINEERING AND CONSTRUCTION CO., LTD., Plaintiff,

v.

## UNITED STATES of America, Defendant.

### No. 02–1914C.

United States Court of Federal Claims.

Oct. 13, 2006.

(3) A copy of the charge;
(4) The Commission's decision, determination, or dismissal, as appropriate.
29 C.F.R. § 1601.28(e) (2005).

**550**

Enver W. Painter, Jr., Honolulu, HI, for plaintiff. Robert M. Fitzgerald and Henry D. Danforth, Watt, Tieder, Hoffar & Fitzgerald, LLP, McLean, Virginia, of counsel.

Brian S. Smith, Trial Attorney, Commercial Litigation Branch, Civil Division, United State Department of Justice, Washington, D.C., for defendant.

## ORDER AND OPINION

HODGES, Judge.

This case arises from a construction contract dispute between Daewoo Engineering and Construction Company and the United States Corps of Engineers. Plaintiff agreed to build a fifty-three-mile road around a tropical island in the North Pacific. The contract requires that the job be completed in 1080 days, just over three years. Daewoo won the contract and received a notice to proceed in June 1999. The three-year construction period did not begin until October 2000 because of environmental concerns, but Daewoo could and did complete most of the preliminary work during 1999 and 2000.

Daewoo's initial bid was $73 million, which was below the Government's own estimate for the Project. The next bid from a contractor was approximately $100 million. The Government warned Daewoo that its bid seemed low and permitted it to increase the bid to $88 million. Plaintiff had no basis for justifying either the initial bid or $15 million-higher bid. Its intent was to obtain the contract, then profit through demands for equitable adjustments.

Trial of this case lasted approximately thirteen weeks, conducted over a period of more than five months. Trial included a site visit to the Republic of Palau. Palau is in the North Pacific Ocean, southeast of the Phillipines. The Government filed fraud counterclaims at the close of plaintiff's case, then presented its case-in-chief. Plaintiff insisted on additional discovery and a rebuttal case, which we conducted several months later in Washington, D.C.

Daewoo's case against the United States is wholly without merit; its claims are fraudulent. The Corps of Engineers has been as conscientious, patient, and fair in its administration of this contract as Daewoo has been demanding, unreasonable, and inept. The road had not been completed in the Spring of this year. We do not know its current status.[1]

## BACKGROUND

The United States entered a "Compact of Free Association" with the Republic of Palau effective October 1, 1994. The Compact called for the Government to build a fifty-three-mile two-lane road on the island of Babeldaop within six years of its signing, by September 20, 2000. Babeldaop is the largest of approximately 300 islands making up the Republic of Palau. It will be Palau's capital when the road is completed.

---

1. This Opinion is written in the present tense when referring to contract terms and claims because the project may not be finished. The trial ended last year.

The Corps of Engineers issued requests for proposals according to a two-step procurement process. The Government and the contractors who responded to the Solicitation understood that completing the job in 1080 days would be difficult, given the tropical conditions and the mountainous terrain. Soils in Palau have high moisture levels that make them difficult to compact, as the road designers and most of the bidders knew well.

Compaction prevents embankments from settling over time, or becoming unstable because of water content or air pockets. Compacting successive layers of fill is the method of constructing embankments used in most of the world's road projects. The project in Palau requires the contractor to construct embankments in layers of fill that are compacted according to industry practice. The Corps lowered the "density requirement" for each layer of fill to eighty-five percent because of the difficult soil content.[2] Ninety percent is the industry standard.

The Government went to generous lengths to cooperate with plaintiff and to help it perform the contract. Daewoo's first bid was $73 million. The Corps suggested that such a bid was extraordinarily low and permitted the contractor to increase its bid. The Corps agreed to time extensions for wet weather irrespective of whether plaintiff's alleged delays were on a critical path.[3] We surmised that Daewoo benefitted from its former reputation as a major international contractor,[4] and from pressures on the Corps to complete the road.

## A. History

The Republic of Palau comprises a very old chain of approximately 300 islands that make up an archipelago on the western edge of the Carolines. Spain claimed the area in 1885, and sold the Carolines to Germany at the end of the nineteenth century. The Japanese obtained them at Versailles after World War I. Following Japan's defeat in World War II, all of the Carolines, Marianas, and Marshall Islands became United Nations Trust Territories under administration of the United States. The United States Government helped improve Palau's infrastructure and its educational system until it became independent in October 1994.[5]

The Babeldaop Road is among the improvements the United States agreed to build pursuant to the Compact of Free Association. Babeldaop contains scattered villages, but is mostly uninhabited. Only about 20,000 people live on all the Palauan islands. Palau's current capital is Koror, but Babeldaop will be the new capital once the road is finished. The capital building on Babeldaob is partly completed; it looks very much like the United States Capitol Building in Washington, D.C. It will house the Executive, Legislative, and Judicial branches of government in Palau.

Palau is about seven degrees off the equator. The weather is usually hot and rainy there, and the humidity is high. The average annual rainfall is 150 inches. The islands do not have distinct wet and dry seasons, but intermittent rainy weather with periods of sunny and windy conditions. Soils in Palau are mostly clay with a high moisture content.

The alignment or course of the Compact Road traverses jungle for most of its length. High forest canopies and thick vegetation

---

2. Density in this context is the proportion of compaction required for an embankment, stated as a percentage of the amount of moisture that a particular soil will hold. Compaction is the process of removing that moisture from the soil.

3. The Weather Clause discloses criteria for judging adverse weather. One purpose of these disclosures is to avoid disputes over whether the contractor has experienced weather that warrants extensions of the contract. This contractor disputed weather-related issues on a regular basis, however. Government representatives met daily with Daewoo beginning in February 2001 to discuss whether plaintiff could work that day.

4. Daewoo had been a major contractor with projects throughout the world, but legal and financial problems caused it to reorganize after obtaining the Palau contract. The Government issued a modification to change the name of the contractor to Daewoo Engineering and Construction Corporation. See PX 178.

5. The Allies had given the Republic of Palau a choice after World War II to become a protectorate of the United States or to become independent. The people of Palau chose independence.

cover the road in many places. The road passes near several small villages.

### B. Administration

The Department of the Interior administers the Compact of Free Association for the United States. The Corps of Engineers has been responsible for designing the Compact Road, for bidding the contract, and for monitoring its construction. The Corps obtained contracts with four Architect and Engineering firms to complete the design. All are based in Honolulu, Hawaii. The road courses through four "Packages" or geographical areas of the Island. Each of the four firms was responsible for one Package. The four Architect and Engineering firms hired GeoLabs, a geotechnical consulting firm, to help them obtain the needed information to complete the design phase of the Compact Road. GeoLabs conducted comprehensive soil studies and compiled detailed geographical information about the Island.

The Corps issued a two-level Request for Proposals. The 1998 Solicitation advised prospective bidders that the winning contractor would be working in geographical conditions varying from tropical mountainous jungle to wetlands and offshore sites. The Corps warned of "significant problems ... including maintenance of traffic flow during construction, environmental protection during construction, avoidance/removal of existing ordnance, maximizing involvement by Palauan businesses and labor resources, sensitivity to local culture and traditions, [and] adherence to the performance schedule and timely completion of the contract work."

The Corps provided designs for the road with the Solicitation, and issued comprehensive geotechnical information to bidders near the end of April 1998. Material in the Solicitation package included the geotechnical reports provided by GeoLabs and other data specific to the Island. The Solicitation's first, qualifying level called for technical proposals to satisfy the Government that a particular bidder could handle the job. Defendant asked those considered technically qualified in phase one to submit price pro-

posals in phase two. Daewoo submitted its technical proposal in June 1998.

### 1. Daewoo's Technical Proposal

The Corps of Engineers rated Daewoo above other bidders in various important areas, including management and personnel. Daewoo's management as proposed to the Corps "had substantial experience on similar road construction contracts." Moreover,

> Daewoo's proposed Deputy Project Manager and proposed Construction Manager had several years of experience with Corps of Engineers contracts and procedures, had successfully managed many different road construction projects, had managed projects with similar soil conditions, and had road construction experience in similar climatic conditions involving heavy tropical rain.

Daewoo impressed the Corps by stressing its job site organizational skills. It highlighted "the importance of applying total project management in order to successfully complete the contract work"

Road construction experience was another key section of the technical proposal. Daewoo emphasized that it had "work[ed] with soils with high plasticity and in tropical climates with annual rain fall exceeding ... (approximately 140 inches per year)." The contracting officer noted that "Daewoo identified several previous contracts that involved similar type road construction in climatic conditions similar to those that Daewoo was anticipating for the subject contract." He listed eight such contracts, "including major road projects in Pakistan, Nigeria, Cameroon, Ghana, Ivory Coast and Malaysia."

Regarding facilities and equipment, "Daewoo stressed that it owned over 6500 pieces of heavy construction equipment," and it was "considering the possibility of using 2–3 construction shifts per day so that it could reduce the number of pieces of heavy equipment required to complete the work." Daewoo "indicated that it would perform the site clearance work and the earthwork itself—proposing to subcontract only some initial work and small sections of site work and earthwork to SOCIO Micronesia." [6]

---

**6.** Testimony and other evidence at trial showed

that Daewoo almost certainly knew this repre-

Plaintiff's promised personal attention to construction of the earthwork was especially important to the Government.

Plaintiff presented a pre-award proposal that seemed to be everything the Corps wanted. Because of these representations, the Corps gave Daewoo the highest technical score of all bidders. After having arbitrarily increased its bid by approximately $15 million, Daewoo's price still was at least $26 million less than the next bid.

### 2. Daewoo's Price Proposal

Daewoo's initial bid was $73 million, well below the Government's own estimate for the Project. The next bid was approximately $100 million. The contracting officer notified six offerors in December 1998 that they were in the competitive range for discussions and gave each offeror a list of written discussion questions.

Defendant was concerned about Daewoo's unusually low bid. The Corps' office in Honolulu issued this appraisal of Daewoo from the Source Evaluation Board:

> The [Source Evaluation Board] has little doubt as to Daewoo's ability to perform this project. Because the price proposal is significantly lower compared to the [government estimate] and the other proposals, the materials quantities in the proposal breakdown were reviewed for errors or omissions. No significant omissions or quantity discrepancies have been noted by the SEB. However, discussions will be required to determine if there are approach and assumptions in accomplishing all the required work at the price proposed. Daewoo also received DCAA's high rating in financial capability to complete this project. Based on best value analysis, the SEB recommends that Daewoo be included in the competitive range.

*See* PX 86 (Price Objective Memorandum).

The contracting officer's discussion letter to Daewoo noted that its proposed price "appeared low in nearly every area...." The contracting officer was concerned about plaintiff's earthwork bid:

> Price appears low. Verify quantities shown in your proposal and provide de-

sentation to be untrue.

tailed description and breakdown for clear and grub, excavation, and embankment and fill line items and provide methodology assumed for construction (e.g., source of material, crew compensation, labor rates, and productivity), used to development unit prices in your proposal.

The contracting officer also asked Daewoo to "provide a rough schedule and narrative, which depicts and explains how you will complete the entire construction phase of the project in 1080 calendar days after award of the contract."

Daewoo responded by acknowledging that it had been "overly optimistic" in estimating productivity. "[I]n reality [it] cannot be achieved due to the amount of time required for drying/aerating, the cohesive soils, settlement criteria for embankment construction, and the constant threat of rainfall virtually every month of the year." Plaintiff reported that its productivity figures for the earthwork had been "considerably reduced," and that it would work double shifts: "[T]wo shifts will be operated and each shift will have 10 work hours for day and night."

Daewoo's schedule and narrative included a "Preliminary Work Program" showing how it intended to complete the work within 1080 calendar days. Daewoo would not perform earthwork "during June, July, August and September of any year." Daewoo's narrative stated that its

> work will start from the fourth month and will continue for 29 months.... The earthwork for soft soil areas and causeways will be teamed up separately and independently from the main earthwork teams. Where possible, work will be phased so that the rainy season will be used as the waiting period for settlement of the multi-stage embankment areas.

Daewoo increased its bid to $88,600,000 in January 1999. Its new proposal included this comment: "We have reviewed in detail[ ] all conditions in relation to the estimation in the course of clarifying the specific discussion items addressed by you and these have been fully reflected in our final proposal revision."

The "discussion items" to which plaintiff referred included Post–Closing Amendments regarding earthwork specifications and compaction standards. They also included the difficulties and concerns raised by other bidders regarding compaction in rainy weather. Daewoo emphasized,

[p]articular attention has been paid to the weather delay aspects together with all environmental concerns and requirements as detailed by the contract specifications and full cognizance has been taken into account in the revised pricing. It is emphasized that Daewoo recognizes and fully understands the importance to the COE of completing the project within the specified time period and will take all measures necessary to ensure that this requirement is accomplished to the satisfaction of the COE.

The Corps conducted discussions with six qualified bidders in the competitive range.[7] Two offerors made no changes in their proposed prices. Three offerors decreased their proposed prices. Daewoo increased its proposed price by approximately $15,500,000 and won the contract. This was a demanding and complex road construction job on a tropical island in the Pacific, where climate and time constraints would create serious obstacles for any contractor. Daewoo's bid was sufficiently low to win the contract but apparently not high enough to interest plaintiff in doing a good job, on time.

## C. Award

The Corps of Engineers approved its Price Negotiation Memorandum on February 8, 1999.[8] The Government recommended award of the contract to Daewoo on March 30:

Recommendation for Award. Source Evaluation Board recommended award to Daewoo based on best value. Daewoo met all of the RFP requirements, received the highest technical score for its technical proposal, and also provided the lowest price proposal. Daewoo has provided adequate information and has explained the approach and methodology used in the development of their price proposal, which indicates they understand the scope of the project. Daewoo has also provided rates that were utilized in their price proposal which explains the difference in price between their price proposal and the Government Estimate. Analysis indicates that Daewoo [understands] the Scope of Work, and an approach/methodology to complete the project. Based on unit prices, approach/methodology, and understanding of the scope of work conveyed by Daewoo during negotiations, the SEB considers Daewoo's price proposal to be reasonable and realistic.

The Corps of Engineers was "excited" that plaintiff won the contract. An official in the Corps testified, it "rarely happens" that the Government gets the most qualified contractor for the lowest bid. Unfortunately, Daewoo merely bid what it thought necessary to obtain contract award then arrived unprepared for a project that required maximum commitment and expertise.[9]

7. "Discussions" in government contracting parlance are the agencies' exchanges with offerors after having established the competitive range. See generally 48 C.F.R. 15.306(d). They are negotiations with finalists in the procurement process undertaken to allow offerors to revise their proposals. Id.

8. See 48 C.F.R. 15.406–3. The Price Negotiation Memorandum documents discussions with contractors in the competitive range. It may include the following:

(1) The purpose of the negotiation.
(2) A description of the acquisition, including appropriate identifying numbers....
(3) The name, position, and organization of each person representing the contractor and the Government in the negotiation.

. . .
(6) If cost or pricing data were required, the extent to which the contracting officer—
(i) Relied on the cost or pricing data submitted and used them in negotiating the price;
(ii) Recognized as inaccurate, incomplete, or noncurrent any cost or pricing data submitted; the action taken by the contracting officer and the contractor as a result; and the effect of the defective data on the price negotiated;

. . .
(11) Documentation of fair and reasonable pricing.

9. This was a major disappointment for government officials. The Corps' administrative contracting officer commented that Daewoo arrived on site "entirely unprepared for the job at hand." [Morrison, Tr. February 16, 2005].

## THE PROJECT

The Corps of Engineers issued a Partial Notice to Proceed in June 1999. The Government advised Daewoo that it could not begin dredging operations as planned because of environmental concerns. Daewoo complained that it could not proceed with most of construction unless it could dredge. The Corps worked with the Environmental Protection Agency to revise permitting requirements. Daewoo received a Full Notice to Proceed on November 1, 1999. This allowed Daewoo to begin all work except coral dredging. Defendant lifted the coral dredging restriction five months later, in April 2000.

The parties negotiated a contract modification that paid Daewoo $12.3 million and extended the contract 347 calendar days because of the coral dredging issue. Daewoo had mobilized its operations well before April 2000 when the Government lifted dredging prohibitions. It had built barracks and site offices by then and placed earthmoving equipment and operators on the construction site. Engineers, superintendents, and other management personnel were present and ready. Daewoo was ahead of schedule by the time it received the notices to proceed because in 1999 and early 2000 because the 1080–day period of contract performance did not begin until October 13, 2000. It had completed clearing and grubbing the entire project and the Government had issued approvals to begin the crucial embankment construction.[10]

Daewoo began its earthwork on a test section in Package B in June 2000. It experienced difficulties achieving sufficient compaction almost immediately. Testing continued for two months, through mid-August. The Government expressed concern to Daewoo about its proposed equipment, construction methods, and lack of progress. Its July 3, 2000-letter [11] summarized the then-current situation:

As you know, work here has been going for a number of weeks.

While rain contributed to the difficulty in achieving the required degree of soils compaction, I believe that there are other contributing factors as well. These include your laboratory testing method or determine maximum dry density of the soil and the equipment you are using on the test section.

Laboratory maximum dry density of soils may be determined using either "dry to wet" or "wet to dry" methods. For this project, "wet to dry" method is preferred when it corresponds to field conditions where you are drying soils prior to compaction. For the fine grained soils encountered in the field I would expect the "wet to dry" method to result in a lower maximum density and hence require less compaction effort to meet the contractually required minimum dry density. This should of course be verified by your own laboratory testing.

In addition, contract specifications 02225 states in part that each layer shall be "plowed, disked, or otherwise broken up; moistened or aerated as necessary ... thoroughly mixed ... and compacted." While the means and methods for achieving the required degree of compaction are up to you as the Contractor, I note that you are not using plows or disks. Your method of using ripper teeth on a motor grader to break up the soil may not be as efficient as other methods for scarifying lift surfaces or aerating and mixing the fine grained soils encountered so far to rid it of excess moisture. Excess moisture can make achieving the required degree of compaction difficult.

Please review your laboratory and field construction methods and consider whether or not different procedures would make meeting your contract requirements easier and more efficient.

While, as previously stated, the means and methods for achieving contract requirements are your responsibility, my staff and

10. Plaintiff could begin earthwork in June and July 2000 for Package B and Package D, September 2000 for Package A, and August 2001 for Package C.

11. The Corps gave advice and made suggestions freely, but always left "means and methods" to the contractor.

I are always available to discuss varies types of equipment and procedures if you wish.

Letter from the administrative contracting officer to Daewoo (July 3, 2000).

The Corps remained worried about Daewoo's progress in late August 2000. The administrative contracting officer wrote: "We are concerned with the difficulty Daewoo is having in achieving moisture reduction in the test sections based on your equipment, practices, procedures, [and] methods...."

Daewoo worked on the test section for another month. It hoped to show that its equipment and its construction methods would create a satisfactory product. Daewoo sent a letter to Mr. Morrison on August 15, 2000. The letter included four daily reports for the test section in package B. The letter stated, "[e]ven though it rained during those four days, the existing soil could be compacted to the specified 85%, with the equipment and methods being employed by Daewoo." Mr. Morrison, the administrative contracting officer, accepted this representation and allowed Daewoo to continue on August 16, 2000.

Daewoo became concerned thereafter whether it could achieve that level of compaction regularly, however. It wrote the administrative contracting officer to suggest that the Corps ease the standards. The letter includes the following:

We are concerned with the difficulty experienced in achieving the required compaction. The weather during the test section process was somewhat variable, but there were periods of good weather when we would expect to be able to achieve passing results with less effort than we expended. The required compaction was only achieved after sixteen passes with a 10.5 ton vibratory roller. This is double the effort we had anticipated. *We shall continue to try additional methods to improve progress.*

Letter from Daewoo to Mr. Morrison (Aug. 17, 2000) (emphasis added). This letter shows Daewoo understood it was operating under a performance specification, not a design specification. Also, plaintiff conceded by this letter that it could complete the project successfully with sufficient effort. The job was not "impossible," but depended on proper allocation of resources. Plaintiff stated that it could not "achieve passing results" with the level of effort that it anticipated, even during "periods of good weather.... The required compaction was only achieved after sixteen passes with a 10.5 ton vibratory roller. This is double the effort we had anticipated." This shows that plaintiff misjudged its needs irrespective of the weather conditions.

We agree with the contracting officer that plaintiff "diverted resources toward examining potential methods that might improve its productivity and Daewoo continued to blame the lack of progress on the *in situ* moisture and the contract-specified requirements." *See* Contracting Officer's Decision p. 43 ("Instead of concentrating on accomplishing the contract work, Daewoo has continuously diverted its scarce and valuable resources to construction of experimental fills and other non-productive activities.").

Daewoo sent a letter September 6, proposing another test section using additional equipment. It informed the Government:

We have attached for your information the technical proposal from Daebon Engineering. We are now proceeding with this study and will inform you of the results as they become available. We are highly concerned with the lack of progress due to the difficulty in controlling the moisture of the soil and believe the above actions are positive steps toward increasing productivity.

A. The Daebon Engineering Report

Daewoo sought additional geotechnical studies of the area from an engineering firm called Daebon, which devised a technical proposal to help plaintiff with its compaction problems. Daewoo presented a series of changes in the contract specifications based on Daebon's study. The study focused on problems that plaintiff was experiencing with Palauan soils and particularly with embankment construction. The Corps responded to Daewoo's concerns in an October 2000 letter, as follows:

Review of the data you have provided indicates that the soils you are encountering do not differ significantly from those indicated in the contract, including the project Geotechnical report. The Daebon plan focuses attention on the possible presence of the mineral haloysite. Haloysite is one of the most common mineral components of residual soils, particularly those derived from volcanic parent material. I do not believe the presence is unusual or differs materially from what is ordinarily encountered here. The nature of the local soils was considered in setting the relatively low degree of soils compaction specified.

I concur that progress in completing test sections in the field has been slow. It appears that this is primarily related to drying the soil to a moisture content which will allow compaction, not to your ability to actually compact the soil once an appropriate moisture content is achieved. I believe this is supported by your test results and continuing efforts to demonstrate you can successfully compact, to required densities, loose lifts of soil thicker than specified in the contract documents. My staff and I will continue to work with you in this regard.

Letter from the Corps of Engineers to Daewoo (Oct. 17, 2000).

The Corps reminded plaintiff repeatedly that "the means and methods to achieve the required compaction are your responsibility." Still, the administrative contracting officer found it necessary to write again to express concern about plaintiff's lack of earthwork progress in Package B:

I request that you review my past serial letter regarding your progress and work procedures for earthwork activities and package B. . . . You have spent the last seven and half months in this area with little to no satisfactory progress or improvement. While I agree that the rain has contributed to the difficulties you have encountered, other factors within your control have also added to your problems. Specifically, I am concerned that your efforts to date have been inconsistent and your inability to prepare and follow a plan is detrimental to progress. It appears that you continue your efforts on avoiding the specification requirements. For example, since September, you have attempted to place thicker lifts in "undocumented fill sections" against my recommendation, and failed to achieve progress. I know that only last week you have again changed your plans and have discontinued your efforts to place thicker lifts. Your actions are impacting your ability to complete the project within a reasonable time period. I request that you prepare a written test section work procedure that you fully intend to follow.

Letter from Mr. Morrison to Daewoo (Dec. 28, 2000).

Daewoo disagreed in practically every respect with the Corps' concerns. It wrote in January 2001:

[We] disagree with your statement that our actions are impacting our ability to complete the project within a reasonable time. We believe you're not taking sufficient account of the poor weather coupled with difficult soil conditions. Our opinion is that we have made and continue to make all reasonable efforts toward progress.

The Government received Daebon's complete report on April 9, 2001. The report recommended modifications to the contract specifications, including a suggestion that the Corps reduce the compaction requirement from eighty-five percent to eighty percent. The contracting officer complied with this suggestion in part. He agreed to lower the compaction rate to eighty percent for the top ten meters of most embankments. Defendant stated in a June 5, 2001 letter that its "acceptance of this alternative criteria is solely for the purpose of allowing increased productivity on your part. It does not imply or acknowledge an error in the existing contract requirement." The Corps did not issue a deductive change order for the lower compaction requirement.

Daewoo continued to have problems constructing embankments despite such accommodations, and it explored additional alternatives with consultants. One such alternative

method was the use of geogrid materials.[12] The Government agreed in October 2001 to pay for geogrid materials that plaintiff would use on a test section. The geogrid materials were part of a method that became known during trial as Traffic Fill Compaction or TCRF.

Meanwhile, the Corps was conducting its own investigation of alternative embankment construction methods. The Army Engineering Research and Development Center in Vicksburg, Mississippi, sent Ron Wahl and Reed Freeman to Palau to investigate the contract's required methods and to suggest possible alternatives.

### B. The ERDA Report

Mr. Wahl and Mr. Freeman were in Palau for seven working days. They reported that reducing moisture content to a level that permitted adequate compaction of Palauan soils would be difficult. Contributing factors were high *in situ* soil moisture content, frequent short-duration rainfall, high humidity, and dense jungle foliage that blocked wind in low-lying areas. The Government had reported these problems in the bidding materials and elsewhere in detail; they were well known to all parties.[13]

The ERDA Report recommended testing the geogrid method, though not necessarily implementing it. The Corps permitted the testing. ERDA recommended reducing the compaction requirement to seventy percent on embankments of less than ten meters. The Government reduced compaction requirements to eighty percent on embankments of less than ten meters and eighty-five percent overall.[14] The ERDA Report and the Corps' response show that the Government tried to cooperate with Daewoo. It considered suggestions that could help complete the job.

The Government permitted plaintiff to construct and compact embankments using lesser—and cheaper—standards than those required by the contract. The Corps considered suggestions from both the Daebon and the ERDA reports, including testing the TCRF method described above. Unfortunately, defendant's concessions on the compaction rate had a perverse effect on some witnesses. They testified, for example, that efforts by the Government to improve plaintiff's productivity resulted in Daewoo's having underestimated the project's overall difficulty.[15]

Plaintiff's attorneys also attempted to take advantage of the Government's cooperation. They argued that the Corps reduced its requirements because the original requirements were "impossible" or "defective." These witnesses and attorneys were willing to offer such testimony and make such arguments despite contrary evidence in their own case. For example, a letter from Daewoo to Mr. Morrison dated August 15, 2000, enclosed four daily reports for the first test section, in package B. The letter stated, "[e]ven though it rained during those four days, the existing soil could be compacted to the specified 85%, with the equipment and methods being employed by Daewoo."

Defendant and plaintiff exchanged a series of letters regarding Daewoo's request that the Government approve thicker fill lifts.

12. The geogrid materials proposed by Daewoo were not discussed in great detail, but their purpose is to enable construction of stable embankments in difficult conditions at a lower cost than methods traditionally used, such as those specified in plaintiff's contract with the Government. Essentially, geogrids are man-made materials that are used to reinforce sloped embankments.

13. Plaintiff noted during trial that Wahl and Freeman did not mention plaintiff's management problems or its lack of equipment or manpower as contributing factors, apparently assuming this meant the Government did not see those factors as problems related to Daewoo's shortcomings. We did not assign significance to these points, however, because it was clear that ERDA's purpose was not to assign blame but to assist the parties by making technical suggestions for improvement.

14. Daewoo bid on and won a contract that required ninety percent compaction without exception—not seventy percent or even eighty percent.

15. Plaintiff's contention that the Corps somehow misled the contractor or disadvantaged it by *reducing* the compaction requirement is typical of Daewoo's approach to trying this case. Such examples show plaintiff's willingness to elicit questionable testimony, apparently to bolster a weak case that Daewoo should not have pursued in this court.

The Corps ultimately denied this further easing of contract specifications "based on the extent of non-compliance with the contract specifications by your subcontractor, the failure of Daewoo to properly plan, manage and control the quality of its earthmoving and the added risk associated with higher lift thickness."

Daewoo sent a letter in October 2000, asking for "blanket approval" to expand work hours and days worked during the week, which the Corps approved. Plaintiff did not say it would work ten-hour shifts to finish the earthwork and the paving as it promised before contract award. It has not worked the ten-hour shifts to date, so far as we know.

Plaintiff did little to help itself construct embankments according to contract specifications. Daewoo did not try scrapers to help compact the fill, which is a standard technique. With one notable exception, it did not lay tarps over embankments to keep the rain off. The single exception was in Package B, where plaintiff's use of tarps enabled it to run successful tests. These tests the results reported in a August 15, 2000 letter stating that despite four days of rain, "the existing soil could be compacted to the specified 85%, with the equipment and methods being employed by Daewoo."

Plaintiff's counsel argued after trial that tarps did not work in the test section, but testimony during trial established clearly that they did. Tarps were among the most successful of the methods available to plaintiff. Counsel stated that tarps would work only if someone were there to take the tarps off immediately when the rain stopped and replace them when the rain began again. This seemed like a reasonable procedure, particularly compared with the "exotic methods" that plaintiff attempted during construc-tion. Daewoo tried "cooking the soil" with a flamethrower of sorts, for example, and constructing tents over embankments to keep them dry.

## C. Pre–Claim Activity

Plaintiff sent a letter to the Corps of Engineers in November 2001, requesting, for the first time, information about weather delay days in the contract. Daewoo wanted to know the Government's criteria for calculating adverse weather for purposes of SCC–1.[16] This should have been a high priority before bidding.

It turned out to be a claim-making exercise initiated by Mr. Cowan. His purpose was not assist Daewoo in planning the job or assembling its bid. He hoped to use it to support claims for differing site conditions and defective specifications that he planned to file against the Government.[17] Plaintiff's claim-related inquiries along with the Government's January 14, 2002 responses were:

1. Referencing Specification Section 00800, Special Contract Requirements, Clause 1, Time Extension for Unusually Severe Weather, how were the Monthly Adverse Weather Days determined?

> Monthly adverse weather days were determined by using historical rainfall data for Koror. A rain event that was 0.5 inches or greater was considered a weather day. Additional weather days were given during the typhoon season. The number of days were adjusted for a 6 day workweek.

2. If historical rainfall data was used to determine the number of adverse weather days per month, what historical data was used?

> As noted above the rainfall data was for Koror.

3. Did the Government anticipate the critical path for the project to be embank-

---

16. These inquiries coincided with a visit from Mr. Cowan of corporate headquarters in Korea. He testified repeatedly that he was there to "review the situation." His purpose however was to take charge of compiling claims against the Government.

17. The differing site condition claim did not arise during trial. Such a claim would not have been valid because the Government provided detailed information about the islands of Palau, the nature of the soils and their moisture levels, and how the soils were distributed. Case law has established that weather conditions or other acts of God cannot be the basis of a differing site condition claim. *Turnkey Enters., Inc. v. United States*, 220 Ct.Cl. 179, 597 F.2d 750, 754 (1979); *Hardeman–Monier–Hutcherson v. United States*, 198 Ct.Cl. 472, 458 F.2d 1364, 1370–71 (1972).

ment work to include processing of excavated materials to reduce moisture content of soils prior to compaction?

The Government did not anticipate a critical path. The methodology for project construction and sequencing of work is the total responsibility of the Contractor.

4. If the answer to 3 above is yes, what percentage moisture reduction was anticipated?

N/A

5. Did determination of adverse weather days include time for embankment surfaces to become trafficable after a rainfall? We note the contract allows days impacted by adverse weather in addition to the actual rainfall event . . .

The determination of weather days was based on historical rainfall data and was not based on the type of construction contract. The consideration for drying time was not included in the weather day calculation. Days in excess of those anticipated are given to the Contractor through contract modification based on the impact of activities located on the project critical path.

Plaintiff submitted a Request for Equitable Adjustment to the Government on March 29, 2002. It alleged that SCC–1 was defective because the Corps did not base the form on relevant and available data. Plaintiff claimed that the Government violated its own regulation in compiling the Clause. *See* ER 415–1–15. This, according to plaintiff,

resulted in a "gross misrepresentation" of the adverse weather delays anticipated during contract performance.[18] It alleged that the contract-provided method for embankment construction was defective as well, and the work was impossible to achieve within the time for performance.

Daewoo's certified claim sought a total of $64 million in equitable adjustments. It demanded $13.4 million in "incurred damages" as of December 31, 2001, and projected additional costs of $50 million not yet incurred.[19] Plaintiff's complaint incorporated the certified claim and also included a total of nearly $64 million in the prayer for relief.[20]

The Government sent Daewoo a proposed contract modification on April 8, 2002. The modification granted Daewoo a 125–day no-cost time extension because of unusually severe weather during the 2001 calendar year. The extension added 125 days to the ninety adverse weather delay days included in SCC–1. Plaintiff refused to sign the proposed contract modification. The Government extended the contract period unilaterally on April 17, 2002. The contracting officer later rescinded that extension, and issued a final decision denying plaintiff's claims on August 14, 2002.

Daewoo filed a complaint in this court on December 19, 2002. Plaintiff's complaint seeks damages for various claims totaling $63.9 million. The claims included defective specifications, superior knowledge, and impossibility of performance.[21]

---

18. Plaintiff also accused the Government of withholding superior knowledge by failing to disclose its definition of an adverse weather day as a day when it rained in excess of 0.5 inches and that it did not include "dry-out days." The next section discusses these issues.

19. As discussed elsewhere, the total amount of the claim has been a moving target. Page 9, ¶ 32 of the Complaint recites the damages included in its March 29, 2002 claim to the contracting officer "wherein it requested damages for the added costs incurred from October 13, 2000 through December 31, 2001, in the amount of $13,348,793.07 and for the added costs incurred *and* to be incurred after December 31, 2001, in the amount of $50,629,855.88, for a *total monetary damage claim* of $63,798,648.95. Daewoo's Claim included a request for an additional 928

calendar days to complete the contract work resulting from delays beyond Daewoo's control and without its fault or negligence." (emphasis added).

20. The total claim submitted was not an approximation, but an authoritative $63,978,648.95.

21. Plaintiff's complaint states at page 6, ¶ 20 that "Daewoo's [September 6, 2000] letter [to the Corps] provided a Technical Proposal from Daebon Engineering, a geotechnical engineering firm, regarding Daewoo's intention to conduct detailed soils analyses in an effort to better understand the difficulties in making progress." This is the sort of expert assistance that plaintiff should have commissioned pre-bid, as some of the other contractors did. *See e.g., infra,* Mr. Djou.

## PLAINTIFF'S CLAIMS

The Government's designs for the Compact Road contained two provisions central to the disputes here. These were the Earthwork Specifications for Construction of Embankments and the Corps' standard Weather Clause described above. The Corps of Engineers uses the Adverse Weather Clause for most construction projects. *See, e.g., DFK Enters., Inc. v. United States,* 45 Fed.Cl. 280 (1999) (interpreting a similar or identical weather clause). A discussion of plaintiff's case against the Government must begin with the Weather Clause.[22]

### A. The Weather Clause

■ The importance of the Corps' standard weather clause to plaintiff's case can hardly be overstated. Weather is the central issue in plaintiff's claim, yet it remains difficult to understand if one assumes good faith on Daewoo's part. Virtually every plaintiff's witness asserted that the Weather Clause misled Daewoo by suggesting that rainfall might not be the problem that plaintiff knew or should have known it would be.

Plaintiff's reliance on the Weather Clause throughout the trial and during most legal arguments was puzzling. Daewoo's complaint includes the following allegation: "As a result of the Corps' failure to follow the guidelines in COE Reg 415–1–15 ... the estimate of the adverse weather delay days as set forth in Special Contract Requirements, Clause 1 is inaccurate and misleading and resulted in an unreasonable and artificially shortened contract performance period." Compl. ¶ 39, p. 11.

The purpose of the Weather Clause was to disclose in advance the parties' exposure for excess adverse weather days during contract performance. The Clause did not and could not predict future weather patterns. The Weather Clause was not misleading given the facts of this case, but if it were, we established that plaintiff did not rely solely on SCC–1 for its weather information, if at all. Daewoo conducted its own investigation of pertinent weather data and arrived at roughly the same number of adverse weather days as did the Government.

■ A contractor cannot claim to have been misled by such a provision as the Weather Clause, even if it were incorrect, after it has tested and verified the representation made by the Government. *T.F. Scholes, Inc. v. United States,* 174 Ct.Cl. 1215, 357 F.2d 963 (1966). Daewoo damaged its case by obvious efforts to coach and lead the witnesses, nearly all of whom testified that Daewoo relied solely on the Weather Clause in planning the project. Daewoo was or had been a sophisticated company that was capable of calculating its own delay analyses. The witnesses' assertions on behalf of Daewoo cast doubt on their credibility.[23]

---

**22.** "Special Contracts Requirements Clause 1, Time Extensions for Unusually Severe Weather," is referred to throughout the case as SCC–1. Post–Closing Amendment 002 changed the original contract version of SCC–1 from sixty-one anticipated adverse weather delay days to a total of ninety days per year. The Weather Clause provides:

(a) In order for the Contracting Officer to award a time extension under this clause, the following conditions must be satisfied:

(1) The weather experienced at the project site during the contract period must be found to be unusually severe, that is, more severe than the adverse weather anticipated for the project location during any given month.

(2) The unusually severe weather must actually cause a delay to the completion of the project. The delay must be beyond the control and without the fault or negligence of the Contractor.

(b) The following schedule of monthly anticipated adverse weather delays is based on National Oceanic and Atmospheric Administration (NOAA) or similar data for the project location and will constitute the base line for monthly weather time evaluations. The Contractor's progress schedule must reflect those anticipated adverse weather delays in all weather dependent activities.

Monthly Anticipated Adverse Weather Delay Work Days Based on 6 Day Work Week

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 6 | 5 | 3 | 5 | 8 | 10 | 10 | 10 | 12 | 7 | 8 | 6 |

(c) Actual adverse weather day delays must prevent work on critical path activities for 50 percent or more of the Contractor's scheduled work day.

**23.** Even the subcontractors that testified were called upon to support Daewoo's theory of the case. Evidently they were told to testify that they relied on Weather Clause almost exclusively. Supposedly they relied on the Clause to formulate their bids to Daewoo. Most of the subcontractors had not read the Weather Clause before Daewoo submitted its claim.

The evasive manner of Daewoo witnesses, particularly Mr. Song and Mr. Cowan, also led to credibility issues regarding plaintiff's reliance on the weather clause.

■ Plaintiff claims that SCC–1 is a defective specification because the Government did not follow its internal guidelines when formulating the Weather Clause. See ER–415–1–15. It maintains that Mr. Furukawa, a government employee who prepared the Weather Clause for the Corps of Engineers, had no experience in generating anticipated weather days. Plaintiff claims that Furukawa did not obtain actual weather data from the weather station in Palau, but relied on in-house compilations.

Daewoo contends that Furukawa's choice of 0.5 inches of rain to denote an adverse weather day was arbitrary, and he did not include days for typhoons until after the Corps sent bid solicitations to prospective contractors. Another Weather Clause issue is whether SCC–1 is defective because the number of anticipated adverse weather delay days did not include dry-out days.[24] Daewoo argues that the Weather Clause caused it to be unaware that construction of the Palau Compact Road within the performance period allocated by the contract was not practical.

The Government complied with ER–415–1–15.[25] Leonard Furukawa was the Corps employee who developed the anticipated adverse weather delay days for SCC–1. Mr. Furukawa has a Bachelor of Science in Geoscience. He had prepared weather clauses using pre-developed numbers of adverse weather delay days for projects in Hawaii, but he had not developed a weather clause

like SCC–1. SCC–1 called for him to decide appropriate weather parameters and apply numerical values to those parameters.

Plaintiff maintains that Furukawa should have considered the effect of humidity on the project, apparently to make this case seem more like DFK. See DFK v. United States, 45 Fed.Cl. 280 (1999). The Government pointed out that Furukawa considered only weather factors that could impede all construction activity, such as rain and cyclones. Humidity could not do that. It was reasonable for Mr. Furukawa to determine that rain and cyclonic events could affect construction activity but that humidity could not.

Mr. Furukawa referenced summaries of weather data maintained and generated by the Corps' in-house planning department and NOAA weather data. ER 415–1–15 does not require that the Corps consider "all relevant available information" in compiling the number of days per month to be set forth in the Weather Clause. It states only that the adverse weather compilation should include an analysis of "NOAA or other weather data." Furukawa decided that 0.5 inches of rainfall was the correct numerical value for defining an adverse weather day caused by rainfall. The weather data he reviewed listed rainfall in increments of one inch and 0.5 inches per day. He testified that he chose 0.5 inch or more per day as the criterion for determining adverse weather days because it was "conservative."[26] Furukawa's decision complied with ER 415–1–15, which does not specify a numerical value for the rainfall parameter. No government policy or regulation defines a "correct" numerical value. Mr. Furukawa's calculations turned out to be very close to Daewoo's own calculations.[27]

---

24. Delays can occur during dry-out days due to adverse weather conditions, irrespective of whether it rained on such days.

25. We could not determine that plaintiff relied on the regulation in formulating its bid, or that it was even aware of such a regulation.

26. Plaintiff seemed blind to the true purpose of the adverse weather clause, which was to provide the contractor no-cost time extensions as appropriate. The Corps' parameters presented extensions to the contractor on days that it rained only one-half inch rather than one inch. Daewoo was interested only in creating a claim from the Weather Clause.

27. Plaintiff would not present its own weather calculations in discovery or during trial. We have not drawn adverse inferences pursuant to the spoliation doctrine because such inferences would be superfluous given the facts of this case. However, plaintiff must have had strong reasons to withhold or destroy such evidence. We considered a separate hearing to inquiring of plaintiff's witnesses whether Daewoo used the same or similar weather criteria in its study, given that it arrived at roughly the same expectations regarding weather as did the Corps. Such findings would have raised serious issues implicating Rule 11 and would have created solid evidence of

Mr. Furukawa did not develop a baseline schedule or prepare a preliminary project schedule as provided in the regulation because the Corps of Engineers had prepared those schedules. He followed the guidelines set forth in ER 415–1–15 when developing the weather clause regardless of whether he referenced the regulation. If the Weather Clause could be considered a contract specification, it would not be defective for lack of compliance with internal guidelines found in ER–415–1–15.

Daewoo argues that the Weather Clause is defective because it was an affirmative representation by the Government of anticipated delays due to adverse weather. SCC–1 does not create an implied warranty of future weather. *See Turnkey Enters., Inc.,* 597 F.2d at 754. Its purpose is to provide a contractual baseline against which to measure the contractor's entitlement to no-cost time extensions. *Carman v. United States,* 143 Ct.Cl. 747, 752, 166 F.Supp. 759 (1958). The weather days shown in SCC–1 were based on past weather conditions. *See, e.g., DFK,* 45 Fed.Cl. at 288 (holding Government's weather delay days were only "an affirmative representation as to past weather conditions"). Daewoo had "no right to assume that the actual weather in the future would correspond to the data on the chart...." *Id.* at 287. Plaintiff was entitled only to "assume that the chart was actually based on the relevant prior weather data." *Id.* The chart was in fact calculated properly, and it was based on "relevant prior weather data." *Id.*

The contracting officer pointed out in his decision denying the claim that the Weather Clause "was never intended to represent the number of anticipated adverse weather days that the contractor would actually encounter during performance of the contract work." This assessment seemed obviously correct during trial, but plaintiff continues to view the Weather Clause as defective, and retains it as the heart of its case.[28]

Money damages are not available for weather delays. Non-compensated extensions of time to complete the contract resolve unexpectedly harsh weather conditions. Daewoo built its case on the Weather Clause and every witness evidently was instructed to comment on it. Its insistence on an illogical argument, however, was damaging to plaintiff's case.

### B. Superior Knowledge

Counts II and III of the complaint allege superior knowledge, which is another weather-related claim with an unlikely application to the facts of this case.[29] Plaintiff contends in Count II that defendant did not inform bidders that Mr. Furukawa computed the adverse weather days using the criterion 0.5 inches of rain per day. Daewoo alleges in the complaint that disclosure of this information was necessary for it to make an informed bid. The defects in the Weather Clause were "neither known to nor reasonably discoverable by the offerors, including Daewoo, prior to either the proposal submission date or the award of the contract," according to the Complaint.

Daewoo could have asked the Corps for this information.[30] It did that when compil-

---

fraud. A separate hearing for that purpose did not seem prudent at the time, however.

**28.** Daewoo probably meant to claim misrepresentation rather than defective specification with regard to the Weather Clause. *See, e.g., DFK,* 45 Fed.Cl. at 288. We have jurisdiction over misrepresentation, a tort, in these circumstances, *see, e.g., Summit Timber Co. v. United States,* 230 Ct.Cl. 434, 440–41, 677 F.2d 852 (1982) (asserting jurisdiction over a case alleging factual misrepresentations). This Opinion does not include a full discussion of the issue. Plaintiff clearly has not proven damages caused by misrepresentation, if that was its intent. As we noted, Daewoo tested and verified the number of anticipated delay days depicted in SCC–1. Whether Daewoo called this a misrepresentation

claim or a defective specification, it has not shown that SCC–1 was inaccurate or that it reasonably relied on the Clause. *See T.F. Scholes, Inc.,* 174 Ct.Cl. 1215, 357 F.2d 963. If everything plaintiff alleged about the Weather Clause were true, it has not shown damages from relying upon government representations.

**29.** Superior knowledge applies where the Government used some criterion other than the one disclosed, resulting in plaintiff's being misled or needing vital information that it asked for and did not get. Daewoo did not ask for any information about the weather.

**30.** *Cf. DFK,* 45 Fed.Cl. at 288 (showing extensive efforts contractor made to obtain critical infor-

ing material for its claim in a January 14, 2002 letter. Daewoo did not show that this information was vital, that it needed to know the information, or that the Government thwarted its attempts to obtain it.

■ Plaintiff claims in Count III that defendant did not reveal its superior knowledge that the Weather Clause did not include "dry-out days" in the total. The contractor was entitled to non-compensated time extensions after ninety days' delay during a year. That is, the first ninety days were the contractor's responsibility. Daewoo's confusion regarding whether dry-out days were "included" was itself confusing. It should have asked.[31]

The contracting officer denied Daewoo's superior knowledge claim. He stated that the "number of anticipated monthly adverse weather days included in the Special Contract Clause 1 was not 'vital' information needed by the contractor and does not rise to the level of 'superior knowledge....'"

■ Daewoo's burden in support of a superior knowledge claim is to prove that the Government failed to disclose a "vital fact" that was not reasonably available to the contractor. It must show that the Government knew or should have known that the missing

information would not be available to the contractor. The vital, missing information must have materially affected performance of the contract. *See J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 53 (1983) (holding government must possess special knowledge that is vital to contract performance, and that is unknown and not reasonably available to the bidder who is thereby misled) (citing *Hardeman–Monier–Hutcherson v. United States*, 198 Ct.Cl. 472, 477, 458 F.2d 1364 (1972)).[32]

*Hardwick Bros. Co. v. United States*, 36 Fed.Cl. 347 (1996) is a superior knowledge case that has interesting parallels to this one. The facts are similar, but the efforts and the dedication of the contractor could hardly be more different from those of the contractor here, Daewoo. The case also presents a vivid example of what the Corps may expect of a contractor doing business with the United States.

The Corps of Engineers contracted with Hardwick Brothers in the late 1970's to construct a system of levees near Brunswick, Missouri. Plaintiff Hardwick filed requests for equitable adjustments after completion of the project. Its claims included defective plans and specifications, differing site conditions, and superior knowledge.

mation about wind conditions on construction site).

31. Or read the answers to questions asked by others. Tutor–Saliba asked a question pre-bid that would have alerted plaintiff to the dry-out-day issue if it had read the bid materials. After analyzing the days available for construction, Tutor–Saliba expressed the following concern: "Considering the above, we think the construction period (1,080 days) is not sufficient. If we follow your specification Section 00800, Clause 1, the actual working days available without considering holidays are approximately 222 per year. So, total working days for 3 years is 666 days. [Taking into consideration anticipated rain days] while we carry out the earth work, we [will] have to wait one or two more days until the soil is dried." *See* Post-closing Amendment # 6, Question 105.

32. *See McCormick Constr. Co. v. United States*, 18 Cl.Ct. 259, 265 (1989), *aff'd*, 907 F.2d 159 (Fed. Cir.1990) (holding logs indicated that well driller would encounter difficult conditions, thus foreclosing driller's claim for equitable adjustment when such conditions were encountered.); *Petro-*

*chem Servs., Inc. v. United States*, 837 F.2d 1076, 1078–79 (Fed.Cir.1988) (superior knowledge doctrine applies in situations where contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, Government was aware contractor had no knowledge of and had no reason to obtain such information, any contract specifications supplied misled contractor, or did not put it on notice to inquire, and Government failed to provide relevant information); *see also Helene Curtis Indus., Inc. v. United States*, 160 Ct.Cl. 437, 442, 312 F.2d 774 (1963); *Ragonese v. United States*, 128 Ct.Cl. 156, 120 F.Supp. 768 (1954). "The government is under no duty to disclose information, such as an opinion or conclusion of its geologist, where the knowledge of both the government and the bidder is based on data equally available to both parties and where more conclusive data is available, but neither party chooses to obtain it." *Granite Constr. Co. v. United States*, 24 Cl.Ct. 735, 744 (1991) (including a comprehensive summary of superior knowledge cases in this Circuit); *see also Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed.Cir.1994) (citing *Am. Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 654 F.2d 75, 79 (1981)), *aff'd*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996).

The Corps provided soil boring logs, but most were at least ten years old when the project was to begin. The borings showed that the types of soil in the proposed alignment "consisted primarily of fat clays with high liquid limits." *Hardwick,* 36 Fed.Cl. at 356. This meant that the soil would "become sticky and present difficulties in supporting construction equipment such as scrapers, draglines and dozers" when subjected to moisture. *Id.* "Thus, the boring logs contained various indications of the difficult, but not unusual, nature of the soil strata at the site and the potential for equipment problems during construction." *Id.*

Hardwick "obtained and reviewed the bidding instructions, studied the Plans, visited the job site, interviewed local residents, prepared 'take-off and quantity estimates' ... [and] made two site visits" prior to bid opening. *Id.* at 362–63. Hardwick representatives:

> examined areas to be traversed by the levee, estimated the amount of timber that would have to be taken out, estimated the size and suitability of the designated borrow areas, determined the amount of trees and brush that would require clearing, viewed the areas where the main concrete structures were to be placed, took soil samples using a two-inch hand-held dynamite auger (so called because it is also used to drill holes for dynamite sticks), tested the stability of the soil at various locations using a small pole five to six feet in length, viewed the old levees to determine the amount of material available in them, estimated the distances required for operating scrapers, appraised the adequacy of the area's drainage, estimated the flow in Palmer Creek, and, based upon the contours shown on the Plans, generally attempted to judge the height of the levee in relation to the surrounding area.

Hardwick's bid was well below those of other bidders and below the Government's estimate. Hardwick experienced many problems during contract performance with "soft soils and wet conditions."[33] It had problems with equipment because of the soft soils and wet conditions. Nevertheless, the facts suggest this was a responsible and conscientious contractor. Hardwick did not file a claim until after the work had been completed because it wanted to "determine exactly what had happened to cause its perceived losses in performance of [the] contract." *Id.* at 377.

Hardwick prepared carefully for the job and carried it through to completion notwithstanding difficulties beyond its control. Its efforts stand in dramatic contrast to those of Daewoo in this case in every respect. Nevertheless, the court placed the entire blame on Hardwick. It ruled that *"Hardwick's bid was unreasonably low* and not that of a reasonably prudent contractor." *Id.* at 380. The court found that Hardwick's shortcomings "included ... undue reliance upon the Corps' borings, its failure to review the [Corps'] field books or even request an opportunity to review them before bidding, its failure to take its own deep soil borings, its superficial and inadequate investigation of local conditions, [and] its failure to anticipate and allow for the possibility of the occurrence of extremely severe weather conditions at the site" *Id.* The court concluded that *"plaintiff's bid was below industry standards and highly vulnerable to bad weather conditions."* *Id.* (emphasis added).

Hardwick completed most of the functions that could be expected of a contractor in the circumstances, but it did not do them well enough in the court's view. In our case, the contractor did little to supplement the Government's geotechnical information, other than to conduct its own weather studies. The *Hardwick* court ruled against the contractor, but its remarks present dramatic contrasts with the manner in which Daewoo has approached its responsibilities:

> [T]he Project was a very difficult levee project from the outset ... there were

33. Some of the worst flooding of the Missouri River to date occurred during Hardwick's contract performance. While "normal flow in the Missouri River at Kansas City upriver from Palmer Creek [the site of the levee] is approximately 41,000 cubic feet per second (cfs) ... during construction, the Corps determined that the flow at Kansas City was between 60,000 and 61,000 cfs. [T]he Corps warned Hardwick that the flow would be 5,000 to 10,000 cfs greater than normal for the coming 1979 season." *Hardwick,* 36 Fed.Cl. at 375.

*very few levee contractors who could have succeeded, as Hardwick did, in constructing this levee in accordance with the specifications,* given all of the difficult weather conditions and other circumstances which Hardwick encountered.

[I]t is a credit to Hardwick's *perseverance and the personal determination* and *integrity of its executives* that it completed the work under such conditions.

However ... *plaintiff assumed the risks of bad weather,* availability of a skilled labor supply, material supply ... *sufficiency of equipment, subcontractor availability, construction methods, and the accuracy of its bid.*

[E]xtremely bad weather conditions were the primary cause of plaintiff's bid being too low to permit it to construct the Project at a profit.

*Hardwick,* 36 Fed.Cl. at 421 (emphasis added). Daewoo's executives attempted to pass along the risks of bad weather to the Government in this case. Plaintiff was not capable of handling a construction project of this magnitude with the management and the supervisory personnel or the workers that it sent to Palau. It did not send the "first team" that the Corps needed, wanted, and had every right to expect on the job.

The Corps of Engineers did not withhold superior knowledge from Daewoo. The Corps wanted badly to complete this project on time, and it wanted a road that the Government could be proud of. Interfering with the contractor by any means was the last thing that the Government wanted to do. Plaintiff appeared to think that showing political pressures on the Corps would help its case, but if such pressures existed, they inured to plaintiff's benefit. Political pressures may explain the Corps' not having terminated Daewoo for default early in the process, and perhaps the Government's leniency as well. The Corps found itself in a difficult position, politically or otherwise, in dealing with Daewoo.[34]

---

**34.** The Corps could not enforce its contract terms strictly; Daewoo would have defaulted. It indulged Daewoo to the point that exceptions,

### C. The Embankment Clause

Count IV of the complaint alleges that the contract's Earthwork Specification is defective. That is, Daewoo's attempts to follow its requirements caused plaintiff delays and additional costs. Daewoo's strategy of attempting to portray the Embankment Clause as a design specification became clear late in the trial. This could be a valid argument only if the contract requirements were in fact design specifications. They were performance specifications, however, and they were Daewoo's responsibility.

Construction of the Compact Road called for a series of "cuts and fills." The terrain was hilly or mountainous. Contractors use cuts and fills to reduce hillsides and other high ground by removing them with grading or digging equipment, then pushing the surplus dirt to lower areas for embankments and fill. The result is a relatively level road bed. This project required the use of fill or other materials to create a total of 3.3 million cubic meters of embankment.

Specification Section 02225, Sub-part 3.7.1—Earth Embankments provides:

The material shall be placed in successive horizontal layers of loose materials not more than 200 millimeters in depth. Each layer shall be spread uniformly on a soils surface that has been moistened or aerated as necessary and scarified or otherwise broken up in such a manner that the fill will bond with the surface on which it is placed. After spreading, each layer shall be plowed, disked, or otherwise broken up; moistened or aerated as necessary; thoroughly mixed; and compacted to at least 85% laboratory density for cohesive materials....

■ The Government impliedly warrants that a contractor following the requirements of a design specification will complete the job in a manner satisfactory to the Government. *See United States v. Spearin,* 248 U.S. 132, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918). If proper application of the designs does not result in a product acceptable to the

waivers and conditional approvals became the norm. DX 1013 CPMI Ex 37.

Government, the contractor is not responsible, but is compensated for efforts to produce an acceptable end product. *Id.*

The Spearin Doctrine has evolved two types of specification, design and performance. Only a design specification produces the implied warranty. *See, e.g., Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir.1987) ("Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results obtained, and leave it to the contractor to determine how to achieve those results."). *See also Util. Contractors, Inc. v. United States,* 8 Cl.Ct. 42, 50 (1985), aff'd 790 F.2d 90 (Fed.Cir.1986); *J.D. Hedin Constr. Co. v. United States,* 171 Ct.Cl. 70, 347 F.2d 235, 240–41 (1965); *J.L. Simmons Co. v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360 (1969).

■■■ The Government is held liable for defective specifications when it mandates adherence to specific means and methods of construction and does not allow the contractor to use its discretion in choosing procedures to accomplish the work. When the Government issues a design specification, it is bound to accept the result that it produces. *See Stuyvesant Dredging,* 834 F.2d at 1582.

> The difference between performance and design specifications in summary is that performance specifications, "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is required to follow them as a road map.

*Blake Constr. Co. v. United States,* 987 F.2d 743, 745 (Fed.Cir.1993) (internal citations omitted); (quoting *J.L. Simmons v. United States,* 188 Ct.Cl. 684, 412 F.2d 1360 (1969)). The cost of completing a job as designed normally would not be an issue because con-

tractors bid on the design given them. The only issues are whether the design works, and if not, whether the winning contractor is delayed or otherwise harmed by attempting to complete the job with the defective design.

■■■ The amount of discretion provided in the contract to choose means and methods determines whether a particular specification is for design or performance. *Blake Constr.,* 987 F.2d at 746. However, the Government can provide some details and directions concerning the performance of work without its necessarily being deemed a design specification. *PCL Constr. Services, Inc. v. United States,* 47 Fed.Cl. 745, 796 (2000). Strict applications of the Spearin Doctrine do not apply to performance specifications. The contractor is free to employ its own means and methods to achieve an end product that is acceptable to the Government, as in this case.

■■■ Plaintiff argued that the contract requirements for compacting embankments were so specific and detailed that defendant should be responsible for any delays in their completion. *See, e.g., Util. Contractors, Inc. v. United States,* 8 Cl.Ct. at 50–51 ("[D]esign specifications are explicit, unquestionable specifications which tell the contractor exactly how the contract is to be performed....").

The Corps encouraged Daewoo to use its judgment and enterprise in completing the difficult tasks inherent in a contract of this complexity. The Government urged contractors to use "creativity and flexibility" in meeting the challenges of compacting soil on a tropical island with persistent rainfall and high humidity. The embankment specifications are consistent with normal construction standards.

Testimony concerning various bidders' technical proposals regarding rock blends and other compaction methods showed that the Corps of Engineers did not insist on a particular design. The Government's specifications for embankment construction are routine procedures that are consistent with road construction methods worldwide. The requirement that embankments be compacted in 200 millimeter "lifts," or layers, also is

standard procedure for embankment construction.[35]

The Embankment Clause in this case was not a design specification. The Government does not care how the job is completed, so long as it obtains what it paid for. Contractors given performance specifications are encouraged to be resourceful and to use their own expertise and ingenuity to complete the job on time. The Corps wanted Daewoo's "creativity and flexibility" in handling the difficult conditions that they would find on Palau. A July 2000 letter from the Corps to Daewoo included the following comments:

> Please review your laboratory and field construction methods and consider whether or not different procedures would make meeting your contract requirements easier and more efficient.

> While ... *the means and methods for achieving contract requirements are your responsibility,* my staff and I are always available to discuss various types of equipment and procedures if you wish.

(emphasis added).

### D. Impossibility

■ A party has no duty to perform a contractual obligation if "performance is rendered impossible or impracticable, through no fault of the party, because of a fact, existing at the time the contract was made, of which the party neither knew nor had reason to know and the non-existence of which was a basic assumption of the party's agreement." *Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1372 (Fed.Cir. 2001) (citing *United States v. Winstar Corp.*, 518 U.S. 839, 904, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)); *Hercules, Inc. v. United States*, 24 F.3d 188, 204 (Fed.Cir.1994); *Opera Co. of Boston, Inc. v. Wolf Trap Found.*, 817 F.2d 1094, 1100–02 (4th Cir.1987); *Restatement (Second) of Contracts* § 266 (1979). Impossibility as a legal cause of action was questionable at best, given the facts of this case. The job today is essentially

complete according to contract requirements, with some exceptions.

Daewoo sent a letter to the Government early in the construction process, enclosing four daily reports for the first test section, in Package B. The letter must have been reassuring to the Corps: "Even though it rained [for] four days, the existing soil could be compacted to the specified 85%, with the equipment and methods being employed by Daewoo." *See* Letter from Daewoo to Mr. Morrison (Aug. 15, 2000).

One of plaintiff's subcontractors, Putra, completed its assigned Package A within the contract period. Plaintiff attempted to argue that Package A was somehow easier or different from the other areas. If so, Daewoo should have devoted additional workers and equipment to packages with more embankments. The key to success on this project was deploying sufficient resources to the right packages at the right time. In other words, proper management. Plaintiff showed no reason why other areas of the project could not have been accomplished as well. Plaintiff spent a year trying to force OCDC to bring enough workers to complete its part of the project. Daewoo would not terminate OCDC when it refused to cooperate, but redistributed its work among other subcontractors. This created added inefficiency and delay. Yet even OCDC had many successful tests at eighty-five percent compaction.

## PLAINTIFF'S CASE

We reviewed trial notes and transcripts carefully to insure that issues of importance did not escape notice during the trial because of the unusual manner in which plaintiff presented its case. Plaintiff did not present a clear legal theory to support its large claim against the Government. It appeared that Daewoo did not expect to find itself in court trying to justify its case; perhaps it thought defendant would pay a negotiated amount.

---

**35.** The Earthwork Specification required that the contractor perform a test section to show that its equipment could achieve the necessary level of compaction. *See* Specification Section 02225, Earthwork, Sub-part 3.7.2—Test Section: "A test section of at least 3 m by 20 m by 2 m in height, utilizing the equipment and procedures proposed for use by the Contractor, shall be constructed to demonstrate that the compaction requirements in this Specification can be produced."

The purpose of the Contract Disputes Act is to prevent this sort of gamesmanship.

The Embankment Clause was so clearly a performance specification that plaintiff's arguments and its witnesses' testimony on this issue were difficult to assess. The discussions of earthwork were pale by comparison with the importance Daewoo attached to the Weather Clause, which was pervasive in plaintiff's case. Nothing about the case was so disturbing as the performance of plaintiff's witnesses, however, particularly with regard to credibility.

## A. Plaintiff's Witnesses

Plaintiff's witnesses tended to testify in a vague and unreliable manner.[36] Some were persons for whom English was a second language, and we have taken that fact fully into account.[37] They did not seem capable of providing testimony that would support a coherent legal theory, if one could have been identified. This was true despite the court's conviction that Daewoo prepared its witnesses with unusual care. We did not have an effective understanding of plaintiff's legal position other than its insistence on having been misled by the Weather Clause.

Daewoo had little idea how it bid this contract, or did not share it with the court if it did. Plaintiff's management could not or would not explain how they calculated the bid. These included members of plaintiff's estimating team, who evidently did not communicate among themselves about the bid's elements.

### 1. Mr. Kim

The testimony of Daewoo's Project Manager is exemplary of plaintiff's credibility problems with key witnesses. Mr. Kim's testimony was difficult to follow and inconsistent on important issues. It was unreliable, and disturbing too.[38]

Kim certified the claim for $64 million, and he testified that he expected the Government to pay the entire amount. Later the same day, he recanted that testimony, stating that the claim was for only $13 million. Plaintiff's counsel made the remarkable argument that Kim's testimony concerning the amount of the claim, and in fact the complaint itself, are "irrelevant."[39] We understood him to mean

---

**36.** We address credibility issues throughout this Opinion. Lack of credibility does not necessarily mean fraud, but a finding of fraud would be unlikely without also detecting substantial credibility problems among witnesses. *See UMC Elecs. Co., v. United States,* 43 Fed.Cl. 776, 803, 816 (1999) ("Shifting representations are often the mark of fraud and dishonesty."). The willingness of so many Daewoo witnesses to flavor the truth suggested such an atmosphere on the job or within the corporation. This is a judgment that we do not make lightly.

**37.** The transcript and the court's trial notes highlight many instances in which such witnesses' fluency in the English language deteriorated markedly once cross-examination began. A number of such examples were so dramatic as to reflect harshly on the witnesses' credibility. The court and the parties had the benefit of competent translators throughout the trial as needed.

**38.** Mr. Kim's testimony contained the following:

Q [Y]ou as project manager knew that you were engaging in a process that resulted in an inaccurate statement of how much work you were doing each month, yet you submitted these forms anyway; is that right? (Interpreter translates.)
A I don't agree.... There are several way to measure the quantity accomplished. This is not final payment. This is interim payment.

If some time we got a little bit more, some time we got a little bit less, but when we finish that section, it can be settled. *I don't think it's big deal.* Tr. p. 9576 (J.W. Kim) (emphasis added).
*See Young–Montenay, Inc. v. United States,* 15 F.3d 1040, 1043 (Fed.Cir.1994) (confirming it is a "big deal").

**39.** At the same time, counsel argued that Mr. Kim certified only $13 million to the contracting officer and not $64 million. Here is what Mr. Kim said:

Q [Y]ou're telling the government by virtue of Exponent's projection of future costs, this is what might happen in the future, or are you actually asking the government to pay you $42 million?
A (Through interpreter) It's hard for me to— It's hard for me to grasp the point of your question. So would you rephrase the question?
Q You've said that the point of putting the future damages in your certified claim was essentially to tell the government to take this seriously.
A Yes.
Q Okay. You didn't know until this morning that one-fourth of the $42 million figure is a projection of future costs, right?
A Yes.
...

that Kim's testimony should be viewed as irrelevant because it was "inconclusive." The testimony was inconclusive because it was "inconsistent." Kim was the project manager. He was the person whom Daewoo authorized to certify claims to the United States on plaintiff's behalf. His "conflicting testimony" on an issue of paramount importance to this case does not go to relevance; it goes to credibility.

Such inconsistencies cast a shadow on Mr. Kim's credibility, but they affected plaintiff's entire case as well. This sort of testimony unfortunately was typical of the manner in which plaintiff prosecuted its claims during trial.

Mr. Kim's testimony also provided examples of Daewoo's lack of good faith. He testified that some part of the claim was intended to indicate "the seriousness of the situation" and to get the Government to "pay attention" so defendant would agree to Daewoo's preferred method of compaction. This is the source of the dispute regarding plaintiff's "negotiating ploy." Using a claim to gain leverage against the United States violates the principle on which Congress enacted the Contract Disputes Act, including its effort to prevent contractors from using the claims process to obtain higher profits. Congress called it "horse trading."

Daewoo's project manager testified that plaintiff filed at least $50 million of its certified claim as a negotiating ploy; Daewoo's counsel essentially confirmed it: "Daewoo's *suggestion* that the Government *expedite* a previously approved and validated alternative embankment placement method is a *reasonable request* that served the projects best interests and, therefore, is grossly mischaracterized as a 'ploy.'" Unfortunately, Daewoo's "reasonable request" or "suggestion" that the Government "expedite" approval of the cheaper compaction method took the form of a certified claim.

Counsel's other response to this concern was the Government had attempted to save money in the design phase of the project:

During the design phase of the Palau compact road, the designer stated that the blending of additives or the use of soil stabilization fabric may be required to facilitate earthwork construction with the very high moisture soils. The Government, however, did not incorporate any of these recommendations ... into the contract because they were considered "too expensive." Instead the Government stubbornly stuck with mechanical aeration as the sole specified means for moisture reduction because, in part, it was less costly.

This is hardly a substantive response to evidence of the Project Manager's using a negotiating ploy to gain leverage against the Government. Plaintiff bid on this project despite such apparent concerns regarding expense of materials, and it bid so low that the Government was concerned that plaintiff could not perform at that level and make a profit. Plaintiff responded to this concern by increasing its bid from $73 million to $88 million.

Plaintiff argued the claim could not have been a negotiating ploy despite the testimony of its Project Manager's because, "[a]pproval was granted before Daewoo even submitted its request for equitable adjustment in March of 2002. Simply put, Daewoo did not submit a claim to receive the Government's cooperation with TCRF—the Government had already granted such cooperation."

Daewoo uses the terms "cooperation" and "approval" interchangeably. We agree that the Corps cooperated at practically every step of this process, including helping to pay for the geogrid materials that plaintiff wanted to test its new and cheaper embankment construction process. Plaintiff still had reason to be concerned whether defendant would *approve* the TCRF method, however, which has not been approved to this day. That was the reason for plaintiff's clumsy

Q Mr. Kim, you certified the claim to the U.S. Government where Daewoo was asking the government to pay Daewoo over $60 million, right?
A *We—yeah, I certified over 60 million—*

Tr. 9294–9431(Kim). The only certified claim in this case is for $64 million. That claim, certified by Mr. Kim and denied by the contracting officer, gave this court jurisdiction to conduct the trial.

threat or ploy. Defendant did not approve the TCRF method and the road today is finished or nearly finished without it.

Plaintiff noted that the Corps agreed to pay for TCRF materials for test purposes, and it asserted that the Corps' resident engineer "declared the TCRF test session a major success" in January 2002, two months before Daewoo submitted its request for equitable adjustment. Then, "[o]n March 22, 2002—one week before Daewoo submitted its REA—the Corps' resident engineer approved TCRF in concept, authorized Daewoo to purchase TCRF material for use throughout the project and stated the Corps' design for the use of TCRF would be finalized in thirty to sixty days."

> [These facts] show that the Corps was addressing the embankment production problem long before Daewoo submitted its claim and, specifically that the Corps had approved TCRF before Daewoo submitted its REA. Daewoo's REA simply presented the actual damages it had incurred due to adverse weather conditions and defective embankment specifications up to the end of 2001, and also provided the Government with an estimate of *possible* future costs. In light of these circumstances, Daewoo's suggestion that the Government expedite a previously approved and validated alternative embankment placement method is a reasonable request that served the projects best interests and, therefore, is grossly mischaracterized as a "ploy."

(emphasis added). Plaintiff's counsel argued that Daewoo filed a certified claim including actual damages incurred through 2001 and *added* to the certified claim "an estimate of possible future costs" as a "suggestion that the Government expedite" its approval of TCRF in its own best interests. This still sounds like a negotiating ploy.

These are the administrative contracting officer's comments in response to Daewoo's tests of the geogrid materials, in context:

> The results of the test fill have been very encouraging ... as you have observed and stated to me the production rates have been much improved. My staff and the design engineer are continuing to evaluate the test fill. We are, however, prepared to validate the concept and give you an option to use the new method.

> The final designs and specifics on the alternative method will not be completed for another 30–60 days. I will be providing those to you. With concept approval I am giving you an opportunity to begin the procurement process for the geogrid material should you chose to use the option. I am doing that now and leave the decision on both the option and the procurement process to you.

> I remind you that I participated on the costs of the test fill, materials only, as a partnering effort. The hope was that we could find an alternative method of placement that would assist you in *improving* production. I believe we have done that. This effort does not invalidate the original design. You are free to use the method that best meets your plans and/or facilitates your completion of this project in the shortest time and most cost efficient manner.

> The TENSAR Geogrid materials used in the test fill met the strength requirements outlined by my design engineer. My conversations with you indicated that your market survey and cost analysis showed that the TENSAR materials provided the best value. Based on that I assume you will chose to use the TENSAR materials for production if you exercise your option for the alternative method. Should you decide you use another material it must be submitted for my review and approval.

Letter from Mr. Morrison to Mr. Kim (Mar. 22, 2001). *See* PX 255.

### 2. Mr. Cowan

Testimony of the highest-ranking witness in Daewoo's corporate management presented another dramatic example of plaintiff's credibility problems. Language was not an issue with Mr. Cowan, who is or was a British subject. He often refused to answer the most basic of questions on cross-examination, even after he sought clarification repeatedly. He said he was sent from corporate headquarters in Korea to Palau to "review the situation." He said that often. His duty on the job site was primarily to supervise the

process of assembling a claim for equitable adjustment. Daewoo's pre-claim inquiry concerning defendant's use of the weather clause coincided with Mr. Cowan's visit to the Island from corporate headquarters. He testified repeatedly that he was there to "review the situation." Mr. Cowan would not tell the court what he was reviewing or the outcome of his review. His primary duty was to compile plaintiff's claim.

Mr. Cowan's other responsibility in the case had been to lead the team that calculated plaintiff's bid.[40] He permitted serious misunderstandings and conflicts regarding the basis for plaintiff's bid to linger throughout pre-trial, and even during trial. Mr. Cowan testified he was unaware that Mr. Song had used 900 cubic meters per day per crew rather than 1200 meters as the embankment productivity rate in Daewoo's final proposal. Tr. 670–71 (Cowan). This "mistake" was widespread among Daewoo officials; people made it repeatedly even though it could easily have been resolved if anyone had reviewed the proposal. *See, e.g.* PX 304. It seemed that plaintiff's use of the higher production numbers in figuring the claim would have had an inflationary effect the amount of damages, but plaintiff's counsel explained that it resulted in a lower claim:

> Daewoo based its final bid proposal on a double shift labor productivity rate of 900 m3 per shift, resulting in a *planned* daily productivity of 1800 m3. (citing Tr. p. 16312 (Cowan)). The evidence offered at trial, however, demonstrates that any mistake in the productivity rate constitutes an inadvertent and immaterial error, which importantly was *never* used as a basis to support Daewoo's claim at trial. *Id.* Daewoo originally intended to 'double shift' its work on the Project. *Id.* In fact, Daewoo only determined that double shifting its earthworks was impractical after experimenting with double shifting during the 'Package B' embankment test section in July 2000. Had double shifting proved

feasible,[41] it would have resulted in a *planned* daily labor productivity rate of 1800 m3, significantly greater than the 1200 m3 rate mistakenly used in Daewoo's claim. *Id.* Because Daewoo's initial claim pricing method was to claim for losses due to its inability to meet its planned productivity, its use of the incorrectly lower 1200 m3 *planned* productivity rate resulted in a lower claim amount.

(emphasis added). Daewoo hoped for 900 cubic meters per crew per day, as we understood it from Mr. Song's bid calculations. Plaintiff calculated the claim based on the difference between what it thought it would produce—the mistaken rate of 1200 cubic meters apparently—and the actual rate, dampened allegedly by the weather. Counsel's argument shows how plaintiff employed the nebulous term "planned" in Mr. Stone's testimony and elsewhere.

We could not rely on the testimony that Mr. Cowan presented so grudgingly on cross. He lacked credibility in practically every respect. He returned to testify in the fraud trial, where his testimony was even more questionable.

### 3. Plaintiff's Experts

Mr. Kim and Mr. Cowan were not plaintiff's only witnesses with credibility problems. Such issues arose in connection with much of plaintiff's case, especially including the testimony of its experts. Mr. Cotton, defendant's certified fraud examiner, testified that Exponent's behavior in this case was at best "professionally irresponsible." Certainly, their testimony during trial and in plaintiff's rebuttal case did nothing to dispel that appraisal for the court.

The testimony of plaintiff's expert witnesses was obtuse. It was not always clear what they were attempting to accomplish or avoid by their use of such careful semantics, however. They jostled with government counsel about whether the firm was hired to

---

**40.** Mr. Song and Mr. Cowan had primary responsibility for drafting the bid. Their testimony regarding plaintiff's reliance on the weather clause in preparing the bid was not credible. Mr. Song and Mr. Cowan generally did not respond to the Government's questions regarding

their bid preparations, and sometimes they contradicted one another.

**41.** This is the closest we have come to finding an explanation of why plaintiff did not double shift as promised pre-bid.

"update" plaintiff's certified claim or to "reprice" it. The title page of their expert report stated that it was an "update." Presumably, they preferred the word "reprice" because Exponent wanted it known that they had nothing to do with the certified claim, which they reduced by more than $20 million from $64 million (or increased by approximately $30 million from $13 million). "Update" would suggest that they started with numbers used in the certified claim and refined them, accounted for passage of time for example, but that was not the case. Each expert deferred to the other for responses to questions that both should have known but could not or would not address.[42]

The experts emphasized that they had not read the certified claim they were to update or reprice. They wished to distance themselves from any numbers or supporting data that had been a part of that claim. The issue became more cloudy later in their testimony. Mr. Allen reported that he may have "looked it over. That's all." Mr. Freas "did not go in and look at Daewoo's bid in its entirety, check every single number, every single quantity. That I did not do." So either they merely scanned the certified claim or they did not read it at all.

Plaintiff's experts formulated a new method of calculating the $64 million claim that Daewoo had certified and submitted to the contracting officer. Exponent's "Measured Mile" method was not a part of the claim that Mr. Kim certified.[43] The experts' method resulted in an entirely different claim to the Government, approximating $42 million. The contracting officer had no opportunity to consider a claim constructed by use of a measured mile, or one for $22 million less than the certified claim. The claim calculated by Exponent using its measured mile approach has not been certified to this day. The claim that *was* certified by plaintiff's project manager became an orphan during trial, supported by no one and barely acknowledged by plaintiff's attorneys.

### 4. Mr. Richardson

Mr. Richardson had spent most of the two years prior to trial working on the claim. Government counsel asked if he had "scripted" his testimony; that is, did he have "the agenda of what you wanted to testify about, not [plaintiff's counsel]." Tr. 1104 (Richardson). We had the same impression of that witness.[44] He pursued this claim with zeal and utter dedication, well beyond the level that might be expected of a corporate witness. Richardson attended virtually every day of trial and served as a sort of lay assistant trial attorney for Daewoo. He was experienced in government contracting and the operation of the Contract Disputes Act as well. Richardson testified both in plaintiff's case-in-chief and in the fraud case. His testimony on direct was an element of his credibility problems during trial, where often plaintiff's attorney could not or did not attempt to control him. His testimony on cross was damaging to his credibility and to Daewoo's case.[45]

Government counsel highlighted on cross the extent of Richardson's participation in plaintiff's claim development process as he had described it during direct testimony: (1)

---

42. For example, government counsel asked Mr. Freas, "Exponent no longer stands by this projected number of $10 million, correct?"
    A You'll have to talk to Mr. Allen about that.
    Q Well, I'm talking to the project manager for Exponent.
    A And as I defined project manager yesterday, that's an administrative responsibility for our project assignments. Mr. Allen is the expert on this area of testimony. You'll have to ask him.

43. Exponent did not explain well the criteria for choosing measured mile comparisons. In some cases, the experts did not use such criteria in any event, but exercised "engineering judgments." *See* PX 280, p. 81.

44. His direct examinations clearly were prepared and delivered according to his views on how the case should be tried. While it is not unusual or improper for witnesses to rehearse their direct testimony with counsel, Mr. Richardson seemed to have taken care of much of his own preparation. Plaintiff's counsel could not always keep up.

45. Mr. Richardson evidently did not prepare so well for his cross-examination, which confirmed the negative impressions that we obtained from the testimony of other witnesses. His testimony during both phases of trial left no doubt that plaintiff's case was unsupportable and was pursued by Daewoo with fraudulent intent.

He analyzed actual adverse weather days incurred on the project, (2) stated his opinion that the .5 inch threshold used by the Corps was "completely inappropriate," (3)constructed a weather model that involved gathering historical averages of rainfall data for ten years, (4) formulated legal theories that were included in the certified claim, including the decision that this was a defective specification claim based on the soil specifications and the weather clause, (5) interpreted the contract clauses involved in plaintiff's claim and testified at length about their meaning, (6) redeveloped the rain clause by applying engineering regulation 415 and his own weather model to arrive at what he thought SEC–1 should have said, (7) compared his weather model to the work done by plaintiff's expert, Professor Moselhi, (8) constructed a flip chart to illustrate the results of his weather studies, (9) applied his weather model to project future rain days, (10) used Mr. Cowen's numbers to apply dollars to projected delays, and (11) assembled and compiled field density tests. *See* PX 295.

Mr. Richardson acknowledged that his "real job" was to be in charge of the project schedule, a major shortcoming of plaintiff's

---

**46.** Mr. Richardson's testimony included the following:

Q  You might sign a claim right now for $63 million?
A  Not for $63 million if it was updated today.
Q  Would you certify it right now?  With this type of data?  Exactly as is.
A  I would probably revise some of the methods of costing that are in it.
Q  So the answer is no, you wouldn't, because you would want to revise some of the methods.
A  Yes.
Q  So that, right now, you couldn't, in good faith, sign a document that says the supporting data in the claim is still accurate today, right?
A  I would believe that the data that is in there, the underlying data, is accurate.  The cost data, not the calculations.
Q  OK. Well this claim as we talked about earlier was an attempt to depict what was going to happen in future right?  That is that Daewoo was going to incur these extra costs.
A  Yes.
Q  Alright. You know that what you thought was going to happen did not happen right?
A  Correct.
Q  So that's one thing that's inaccurate.  [If] everything in that claim, in this certified claim that led to the prediction that what you thought was going to happen and didn't happen, all of that data is wrong, right?

---

case.  Richardson testified that "somebody else" was handling the schedule during that period though, "I still participate to some extent, not the way I was before."

The witness clearly attached importance to his contributions in developing the claims and presenting them to the court, including the technical and legal assistance that he contributed to the certified claim itself.  Often he would anticipate or reinterpret his counsel's questions, or worse, correct them.  Yet asked on cross if he would certify the claim today, he became vague.  Finally, he testified that he would "probably use a different method" because his knowledge then was different from now but he refused to say he would not sign it today: "I can't say that.  I think it was reasonably done and, yes, I might sign it.  Yes." [46]

### 5.  Mr. Stone

Mr. Stone showed up on Palau for a week or so to make crucial calculations that appeared on two pages of plaintiff's claim and had broad implications for Daewoo's case.[47]  His task had been to handle plaintiff's loss of productivity claim.  Stone testified that he

A  That would change as far as the future estimate yes.
Q  OK . . . you do not believe that $13 million, $50 million or $63 million accurately reflects the contract adjustment to which Daewoo believes the Government is [responsible]?
A  I would have to answer I would have to compare, at this point in time, how those costs have accumulated as they have been shown in the methods shown by the REA.
Q  Mr. Richardson, didn't you hire [Exponent] to do that for you?
A  Yes.
Q  And they didn't come up with the same numbers right?
A  They used different methods.
Q  Alright well not only did they use different methods, but they came up with a significantly lower number right?
. . .
A  They came up with a different number.  Yes they did.

**47.** Mr. Stone's name had not been on the witness lists, and no one had mentioned him until the waning days of trial, during the cross examination of Mr. Richardson.  The circumstances were such that frankly, we wondered whether he was a real person.

discussed the matter "at great length" with Cowan, Richardson, and Painter, and decided the best way to show losses for the certified claim was to use the amount that plaintiff *planned* to spend, rather than the amount actually spent for earthwork. He knew how much earthwork Daewoo had moved, but it was not so clear how he developed its unit cost, the "planned estimated actual cost" as he put it. He testified that the company's books and records did not show the actual cost per unit.

Mr. Stone's narrative in the claim does not identify the cost of operations as *planned* cost of operations, however. Stone omitted the word "planned" and wrote, *"the cost of operations* was $3.3 million." Tr. p. 17430–17431. That is the number in the claim. Asked whether "[i]t is possible to go into Daewoo's books and records to figure out what Daewoo's costs of operations for excavation really were for that period of time," Mr. Stone responded, "I don't know." Tr. p. 17434–17435 (Stone).

> Q You're saying that there were people coming in and out of the room and that the decision was made to not use Daewoo's *actual* cost of operations, but instead to depict Daewoo's costs of operations as this $3.3 million figure . . . ?
>
> A I was asked to do a calculation for loss of productivity . . . . and I chose to use this method that we discussed at great length between Mr. Richardson, Mr. Kim, Mr. Painter and myself. . . . Tr. p. 17433.
>
> Q Did you decide to use the words *"the cost of operations was* . . . ?" Tr. p. 17434
>
> A Yes, I did.
>
> Q And it is not *actually* the cost of Daewoo's operations, true?
>
> A It is by the way I developed this document, it is.
>
> Q We already agreed earlier, didn't we, that it is actually the *estimated costs* that Daewoo planned to have spent, rather than the actual costs?
>
> A I don't say actual cost. I say the *cost of operations.* And the document describes how I came about that number. I don't say it's actual costs or not.

To get a number to subtract from the planned cost of operations, Stone looked at actual production, in this case a number of cubic meters of material that Daewoo had excavated as of December 31, 2001. This number was 755,000 cubic meters, which he obtained from progress pay estimates.

> Q So you looked at Daewoo's actual records to determine what they had actually excavated, true?
>
> A Yes.
>
> Q And then you multiply that by $1.70 true?
>
> A Yes.

Tr. p. 17435

Government counsel wanted to know how Stone knew Daewoo spent $1.70 per cubic meter to excavate that 755,000 cubic meters. He responded, "[t]hey had estimated that would be their *planned* cost and so forth."

> Q Right, so this is actually a planned number not an actual number, true?
>
> A It is the same type of estimated plan, *actual cost estimate* for that unit of production.

The Government asked about the records available to figure the cost of excavating the 755,000 cubic meters of material.

> A "You don't know, true?"
>
> A No, as far as I was concerned Daewoo kept very good records.
>
> Q OK so all Daewoo needs to do is consult its very good records to figure out whether it *actually spent $1.70 per cubic meter* of material excavated right? . . .
>
> A It would depend on how they kept their job cost records. *I don't know* . . . what format they kept them.
>
> Q Alright, is it fair to say that you, Bill Stone, did not make an effort to figure out [Daewoo's] *actual cost per cubic meter* . . . ?
>
> A My approach was to take a scheduled value unit price and subtract the home office overhead and the profit, determine a cost, and estimate a cost that was a *planned actual estimated* cost. . . .
>
> Q Did Daewoo bill $1.2 million for the excavation during that period?

A  They billed that in addition to the home office overhead and the profit, [$2.02] but the $1.70 was included in the 202.

Q  OK, we've got this number, that is an actual number right?

A  Yes.

Q  But this $1.70 is not?

A  It's a *planned, estimated actual cost.*[48]

Stone's claim narrative states, "Daewoo's cost is calculated." The Government asked whether it would have been more accurate to state, "Daewoo's *planned* cost is calculated."

A  A more accurate way would be Daewoo's *estimated planned actual cost* would be more accurate.

Q  OK, then here we are now down at the bottom line. We take that $3.3 million figure that you calculated as Daewoo's costs of operations up here and we're going to subtract just $1.2 million that was billed during this period and there's your claim, right, $2.023, right?

A  Yes.

Q  By the way, if you had used the actual dollars that were billed to the Government for excavation, it would be a higher number right? You would use the $2.02 number?

. . .

A  Yes, which would include overhead and profit.

Q  Exactly. And if you used the 2.02 figure that would increase this number to $1.2 million number ?

A  Yes.

Q  That would lower the claim, true?

A  Your mathematical example is correct.

The reason that plaintiff used this imprecise method, other than its inflationary effect on the claim, was either that Daewoo's books and records were not sufficient to calculate a better number, or because management did not want to look at the books and records. The latter approach is the one plaintiff took when using the Corps Manual rather than

actual costs of acquisition and maintenance of equipment.

Q  Your cost of operations figure is not based on any *actual cost* of operations right?

A  It's based on *actual, estimated costs.*

Stone testified that the cost of operations do include some actual costs because "it's made up of whatever the total expenditure would be, whether it's estimated or an exact number. This is an actual estimate of that, based upon our schedule values." Tr. p. 17445 (Stone).

Q  You can go to Daewoo's books and records, figure out how much they spent for excavation, compare that to how much they planned to spend and if it numbers the same there's no loss of productivity, OK?

A  Yes.

Q  Let's go back to Daewoo's books and records and the decision not to consult Daewoo's books and records to figure out how much Daewoo *actually spent* to do excavation. Isn't that a good way to look and see whether Daewoo actually experienced a loss of productivity or not in the first place.

A  That's one method.

. . .

Q  You don't know as you sit here today whether Daewoo spent $1.70 per cubic meter to do this excavation, the 755,000 cubic meters or not right?

A  [T]he analysis that I did was based upon this methodology. There are other methodologies which you can use. Measured mile, actual cash expenditures, or this method.

Defendant tried again:

Q  You don't know whether Daewoo spent $1.70 per cubic meter of excavation to do the 755,000 cubic meters during this period or not correct?

A  They told me that the cost of this item had *greatly exceeded* any planned activity or planned expectations that they had.

48.  Plaintiff's attorneys used the same device: "Daewoo based its final bid proposal on a double shift labor productivity rate of 900m3 per shift, resulting in a *planned* daily productivity of 1800 m3."

. . .

Q How do you arrive at the opinion that Daewoo has greatly exceeded its planned expenditures for excavation, unless you know how much they spent.

A I didn't arrive at any opinion.

Q Right, you were told?

A No I was asked to perform a calculation.

Q Mr. Stone you just said you were told that they had greatly exceeded their expenditures beyond any plan for excavation. Is that true or not.

A *In a general sense yes.*

(Emphasis added).

Mr. Stone knew only that the cost per cubic meter of excavation to move the 755,-000 cubic meters "greatly exceeded" the amount plaintiff had planned to pay for the job. He knew this because Mr. Cowan and Mr. Richardson told him. Somehow, he arrived at $1.70 as the unit cost and subtracted the planned amount from the "actual" amount and used that as Daewoo's loss of production attributable to the Government: $3.3 million.

### 6. Mr. J.H. Song

Mr. Song was the Geotechnical Manager. He was coordinator of the estimating team for the Palau Compact road project. His testimony presents a common example of how difficult many of plaintiff's witnesses were to follow:

Q Did anything that happened between April of 1998 and Daewoo submitting its final bid in January of 1999 cause you to change your conclusion that reducing the high natural moisture content in the soils of Palau would be a difficult task?

A Yes.

Q Something caused you to change that opinion, is that right?

A No. Basically, the aeration and the drying of the high moisture contents is difficult.

(Song, Tr. p. 2430). Yes or No? Despite his expertise as a geotechnical engineer, Mr. Song was comfortable offering the following testimony to clear matters up:

Q Okay. So you're saying that when, later in this report, they talk about lowering the percentage to 85 percent, you interpreted that as eliminating the need for significant drying, is that right?

(Translator speaks in Korean.)

A (By Translator Lee) Yes.

Q Okay. And that is why you said, in April, you thought this project was going to be difficult to reduce moisture content, but then, when you got the geotechnical report, you changed your outlook and thought that it would be easy, right?

A Yes. Our construction, I thought will be easy I think. I thought like that.

. . .

I think the reduc[tion] of the moisture content is very difficult. But, after receiving of the geotechnical report, the designer already knew the situation. They already recognized the situation. So they already make a test. So they make a reasonable compaction nature considering the high moisture and the drying. Yes.

Q *[T]he geotechnical report, is the only reason why you changed your opinion that this job was going to contain a difficult soil moisture reduction amount of work, is that right?*

(Translator speaks in Korean.)

A Yes.

Q Okay. Nothing else caused you to change that opinion. No investigations that you had done yourself. No books or anything that you had read. No interviews with other people about what it was like to work in Palau. You thought this was going to be hard until this geotechnical report assured you that it would be easy, is that right?

A Yes.

(Song Tr. p. 2436–7) (emphasis added).

Plaintiff's geotechnical engineer, and a key member of its estimating team, testified that the Government's willingness to reduce the compaction requirement from the normal ninety percent to eighty-five percent to assist contractor productivity, caused him to believe

that the compaction job would be "easy." [49] This testimony was not credible. [50]

### 7. Mr. S.K. Djou

Mr. Djou was a geotechnical expert. He testified for Daewoo, but the significance of his testimony to the court was that earlier, he had been a consultant to Tutor–Saliba, a reputable contractor that participated in the bidding process on Palau. He testified that a "competent contractor" would have hired an expert to assist in the bid, as Tutor had by hiring Djou himself. Daewoo did not hire an expert to help with its bidding process.

Daewoo had criticized Mr. Lim, the engineer at GeoLabs who compiled the technical information for the Corps' geotechnical report, suggesting that the material was misleading or that he made recommendations that were not achievable. Djou testified, however, that Mr. Lim had "engineering choices" to make regarding the density issues and other matters related to soil compaction, and he, S.K. Djou, did not think the choices Lim made were unreasonable. [51]

### 8. Professor Moselhi

Professor Moselhi submitted a report analyzing the weather in Palau and predicting its impact on this Project, according to plaintiff's counsel in post-trial briefings. See PX 278. Plaintiff stated: "Professor Moselhi testified that the weather in Palau would cause 169 days of weather delays to the earthworks to be performed on this Project, assuming 'average' drying conditions," Tr. at 2101–2105 (Moselhi). He also testified that drying conditions in Palau could be classified as "poor." Well, yes. This was the point of the pre-

Project disclosures and the warnings to bidders that are sprinkled throughout this Opinion. This would have been a helpful report for Daewoo to have commissioned before bidding on the Project, but it did not. Daewoo was among the bidders that did not heed the Government's and GeoLabs's warnings and obtain expert assistance in compiling its bid.

### B. Productivity Rate

No issue other than the Weather Clause commanded so much attention as the "mistake" that plaintiff's witnesses claimed everyone at Daewoo overlooked for so long. The productivity rate for excavation was an enduring mystery during trial. No one seemed to know how it was calculated, or even who calculated it. No doubt exists as to its effect, however. Mr. Cowan and his estimating team supposedly assumed that Daewoo would excavate 1200 cubic meters of fill per shift, per day, in calculating its bid. This is the number that Mr. Richardson and others, including Mr. Cowan, and especially Mr. Stone, used to calculate Daewoo's loss of productivity for purposes of the claim. That number either changed or always had been 900 cubic meters per shift, per day instead. This problem arose repeatedly during trial, and plaintiff's experts did not attempt an explanation.

Mr. Song was the person who put the bid together, but no one asked how he arrived at the productivity rate used as a basis for the bid calculations. Mr. Song did not document his method of bid calculation. His bid papers were illegible scribbles on a few pieces of paper. [52] DX 1051 (Song Bid Papers). No

---

49. Plaintiff stated at paragraph 27 of its complaint that the Corps of Engineers:

> [r]ecogniz[ed] the difficulties of building the embankments as specified in the contract, and as a result of the Daebon Report recommendations and subsequent meetings between the Corps, Daewoo, GeoLabs, Daebon, the Corps lowered the relative compaction requirement for embankments from the Government specified 85% to 80% in the top ten meters of the embankments. The lower compaction requirement was approved without a deductive change order.

It is difficult to know how plaintiff must have interpreted this change, to include it in the complaint. We viewed it as another example of the Government's making every effort to help in-

crease plaintiff's productivity while still maintaining minimal professional standards.

50. Witnesses also were willing to testify that Daewoo was misled by a document describing the need for aeration of soils for compaction as "some" rather than "substantial."

51. Plaintiff did not review its field density tests, which would have shown that eighty-five percent compaction was readily achievable. DX 1021 (Assorted Field Density Test results).

52. Government counsel appropriately termed it a "bar napkin approach." He introduced Tutor–Saliba's calculations for its bid, which appeared to be a detailed spreadsheet printed from a computer.

one who worked on Daewoo's bid proposal (Cowan, Richardson, Kim, Painter, Stone) attempted to understand Song's estimate or ask Mr. Song about his calculations.

Mr. Cowan testified that he had not seen Mr. Song's bid papers until a year before trial. Tr. 670–71 (Cowan). In fact, he made no effort to gather information related to the formulation of any aspect of Daewoo's bid price. Tr. 680 (Cowan). Mr. Cowan was not confident that basic information such as whether the bid was based upon ten or twelve-hour shifts exists. Tr. 685 (Cowan). Mr. Cowan testified that he has never seen documentation for the production rates used by Daewoo. Tr. 822 (Cowan). Production rates might have changed when Mr. Song adjusted the periods in which Daewoo would be doing earthwork. PX 109 (Final Proposal); Tr. 2400, 2402 (Song).

Daewoo's experts used the 1200 cubic foot productivity assumption in their claim calculations. This had the effect of inflating their version of plaintiff's claim substantially. Mr. Freas, who calculated Daewoo's delay damages, did not ask questions about the productivity rate, though his entire analysis was based upon the premise that Daewoo's 1200 cubic foot rate was reasonable.[53] Mr. Freas acknowledged that if he had conducted an investigation of the supporting data in Daewoo's claim, the "number would be reduced." Tr. 12883–84.[54]

### C. Plaintiff's Inefficiency

Defendant showed that plaintiff's inefficiency and other problems were attributable to Daewoo and its subcontractors, not to the Government. Most problems with operations on-site were not related in any way to the Corps' activities. Plaintiff made no effort to separate from the claim defendant's substantial evidence of plaintiff's own delay and inefficiency. An extended discussion of such

53. Daewoo admitted finally that its 1200 cubic meter per crew, per day rate was overly optimistic, and that its bid proposal was based on 900 cubic meters. Such lack of diligence and willingness to investigate basic facts related to the claim enabled the creation of a false record.

54. Mr. Freas testimony contained the following:

problems seems unnecessary in a lawsuit devoid of government liability.

One example was plaintiff's problems obtaining reinforced concrete pipe, which was delivered late or in pieces. Daewoo needed reinforced concrete pipe for culverts and other drainage facilities. Mr. J.W. Kim, plaintiff's Project Manager, wrote this letter to Daewoo's supplier, Lysander Shipping in January 2002:

I am writing to express my concern and disappointment with the services you are providing in relation to the current shipment of concrete pipe from Indonesia. Although the original estimated time of arrival to [Palau] was November 22, 2001, we have still not received the shipment and have not been provided a firm: date when we can expect the pipe to arrive. Since the original ETA of November 22d we have received from you five separate estimated times of arrival ranging from December 6th to the most recent date January 4, 2002. We understand the shipment is still in Indonesia either awaiting repairs to the tug or "better weather"and the January 4 date is not valid. You need to he aware that our company has been damaged by the late arrival of this shipment. Lack of concrete pipe has caused delay to the project and has exposed us to claims by our subcontractors. Costs associated with the delay include standby of labor and equipment. We intend to recover these costs from your company.

Letter from J.W. Kim to Lysander Shipping (Jan. 4, 2002); DX–1013; CPMI Exhibit 66.

Most of Daewoo's subcontractors were not effective substitutes for the "first team" that plaintiff promised to use on this job. Nowhere was this more evident than in construction of embankments and other earthwork. Plaintiff had serious problems with

Q You didn't check the quantities or the production rate that you put into your report. That was one of the things you didn't do, right?
A The 1200 number?
Q Yes.
A That was expressed in the report as it is.
Q Right, and we now know that a thorough investigation would have revealed that number was wrong, correct?
A That number would be reduced.

subcontractors who were deficient in a number of areas, according to Daewoo itself. Such deficiencies attributable to one subcontractor, OCDC, were in the areas of management, manpower, and equipment. An early letter from plaintiff's project manager, M.S. Kim, to OCDC, states:

We are writing to express our concern with your lack of resources needed to complete this project in a timely manner. While we acknowledge the difficulties we have all been experiencing with the weather, you do not have sufficient management, manpower and equipment on site to take advantage of the improving weather conditions.

MANAGEMENT: Currently, in Package B, you have no office engineers and only one field engineer. Your project manager Mr. Calawen is acting as office engineer and subsequently has no time to control the field work. In Package A, there is no site manager. This is totally inadequate and is resulting in poor progress and poor quality of work.

MANPOWER: Your current staff of equipment operators is far below what is needed to maintain satisfactory progress. Rather than increase your work force, you are actually returning men to the Philippines. This displays your total lack of concern for progress on this project. We find that you are 51 personnel short of the staffing required. You have only 3 common laborers. When common work is required to be done, your equipment operators are taken off earthwork and are used elsewhere. We find that you are short 32 equipment operators. To our embarrassment with the Owner, we find that one operator will act as operator for a single operation involving excavator, loader and dump truck. Again, this is totally unsatisfactory. Further, you have no blasters on site. Rather than being able to carry out blasting by your own forces, we have to take personnel from other sites to carry out your work.

EQUIPMENT: Your equipment is inadequate only in that we believe you to be lacking 4 jack hammer attachments for excavators and perhaps one additional excavator is required. While your equipment spread is closer to meeting the requirements, what use is the equipment without operators to man it?

Letter from M.S. Kim to OCDC (Jan. 23, 2001). Problems with OCDC continued, but Daewoo did not remove that subcontractor from the project. Instead, it re-assigned the work to other subcontractors.

Sunjin was another subcontractor that created problems and delays for Daewoo. Sunjin was responsible for producing concrete for the project, an important supply. Daewoo terminated Sunjin in March 2001, two years into the project, because "[y]our continued lack of performance has caused significant delay to the project and it has damaged our company." See Letter from Mr. Kim to Sunjin (Mar. 20, 2001). Sunjin had been a major subcontractor, providing materials important to building the road. Terminating such a subcontractor two years after beginning contract performance caused plaintiff to effectively start over in some areas.

The transcript contains many examples of plaintiff's own delays and those of its subcontractors. Other examples are its problems with bridges, culverts for proper drainage, survey errors, cold joints for concrete work, and asphalt production. Plaintiff's answer to most questions about its inability to quantify alleged damages and to separate and account for its own delays, was the use of the "measured mile" approach by Exponent. Daewoo did not certify that method of estimating delay costs, however, or the "claim" that resulted. Daewoo did not submit the claim or its supporting data to the contracting officer for consideration.

### D. Measured Mile

The measured mile approach to damages is a form of total cost calculations that requires subjective judgment calls by the expert, who estimates damages by comparing periods of production that are unaffected by the contractor's alleged government-caused delay, with periods during which delays affected its production adversely. In this case, rain days were used to determine government-caused delay for the most part. The experts merely compared periods affected by rain delay with periods unaffected and presumably efficient,

and developed an inefficiency factor. They applied this factor to the project and applied a cost of delay to calculate total costs through completion of the contract.

Contract Boards have accepted the Measured Mile method on occasion. We assume that a finder of fact faced with such a method of estimating damages would want to have confidence in the experts' ability and objectivity. A court would be particularly concerned to know how the experts picked periods of productive and non-productive construction for comparison. We did not have such a level of confidence in plaintiff's experts. Cross examination showed their choices of productive and non-productive periods to be arbitrary at best. More likely, they were chosen to achieve a pre-determined result. Mr. Cotton testified that Exponent's approach to this assignment bordered on the unprofessional. We agree for reasons that appear throughout this Opinion.

### E.  Schedule

█ Contractors have the burden of proving delays attributable to the Government. It may be impossible to establish government-caused delays without a means of showing the critical path. *See, e.g., Wilner v. United States,* 26 Cl.Ct. 260, 274 (1992) ("Without a critical path analysis, the court [could] not exclude the possibility that the contractor caused concurrent delay on the project.") *rev. on other grounds, Wilner v. United States,* 24 F.3d 1397 (Fed.Cir.1994).[55]

If Daewoo were entitled to damages due to defects in the Weather Clause or the Embankment Clause, plaintiff could not have calculated those damages properly.[56] Trial

exhibits contain no evidence that Daewoo scheduled this project pre-bid by use of a critical path method or similar device.[57] If plaintiff developed such a schedule after arriving at the site, we doubt that Daewoo used it properly, if at all. Contractors must have such a schedule to perform complex construction tasks properly over time. A critical path or similar plan is an important tool for any contractor attempting to complete a project so complex as this one, where many tasks are interdependent. Daewoo's contract required it.

Plaintiff's ability to schedule complex, interdependent tasks was far more important to the Government than Daewoo's ability to prove any claims that might arise. Daewoo did not provide a critical path or similar schedule to the Corps that showed the project's being completed according to contract requirements. Thus, Daewoo was unable to budget its time so that it would clear and grub, cut and fill, move earthwork and construct embankments, pave roads, and complete the job on time according to contract specifications and requirements. This is evidence that plaintiff's alleged surprise regarding the amount of rain on Palau or the difficulty of compacting its soil as a reason for delay was invalid and untrue. Daewoo did not provide the Corps a schedule showing it completing the work on time because it could not.

## DEFENDANT'S COUNTERCLAIMS

The character of the trial changed dramatically when the Government sought leave to amend its answer to add fraud counterclaims.

---

55. The *Wilner* trial court made this observation, having completed a thorough review of trial testimony and other exhibits: "Unfortunately, [plaintiff] failed to supply a critical path analysis, and the court is not obligated to attempt to construct one for him. Due to the absence of plaintiff's view of the critical path, the court cannot assign weight to any concept of the critical path as propounded by plaintiff." *Wilner,* 23 Cl.Ct. at 256.

56. No time extensions were due for work not on the critical path regardless of how severe the weather Daewoo experienced. Daewoo must have been attempting work on the critical path and been prevented by weather for at least half the working day to qualify for a non-compensat-

ed extension of time under the contract. Tr. 14899 (D'Onofrio); DX 1039 80/95.

57. *See, e.g., Wilner v. United States,* 24 F.3d 1397, 1399 n. 5 (Fed.Cir.1994) ("A 'critical path' is a way of grouping interrelated activities in a construction project. A delay to an activity that is on the 'critical path' usually results in a corresponding delay to the completion of the project. The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path had an impact upon the time in which the project was completed.'") (quoting *G.M. Shupe, Inc. v. United States,* 5 Cl.Ct. 662, 728 (1984)).

The timing of defendant's motion was a concern, and we considered carefully whether the amendment was reasonable and timely in the circumstances. Defendant's counsel represented that he did not anticipate all of plaintiff's testimony and could not have. He did not anticipate even some of plaintiff's legal arguments. These assertions were understandable given the nature of plaintiff's presentation of testimony and other evidence during trial. We were similarly surprised by the proceedings, and dismayed.

The evidence of fraud arose from and during the testimony of plaintiff's own witnesses, during its case-in-chief. This was another reason to permit defendant's counterclaims. The Government showed primarily through cross-examination that it was not liable on plaintiff's claims, and that Daewoo's claims were fraudulent. Defendant used its own case to establish additional evidence supporting findings of fraud and quantifying them. Defendant did not hire new experts to pursue its fraud counterclaims or call new witnesses. Its accountants expanded their testimony somewhat to include additional examples of plaintiff's efforts to inflate its claims. We offered plaintiff's counsel the opportunity to depose defendant's expert witnesses on the expanded testimony, but they declined.[58]

Despite the magnitude and importance of this case, plaintiff did not present a coherent legal theory for recovery other than its insistence on having been misled by the Weather Clause. Every witness seemingly was instructed to emphasize that the Weather Clause was misleading. The Embankment Clause received far less attention, with good reason: it is a performance specification that leaves the means and methods of construction to the contractor.

The Government is entitled to judgment on all its counterclaims for reasons discussed throughout this Opinion. Plaintiff made obvious mistakes and overly-optimistic assumptions in its bid proposal, but its claims against the Government go well beyond mere error or oversight.

## A. Fraud

Daewoo bid the road construction job improperly and handled its basic management inefficiently. Its legal theories remained diffuse and uncertain throughout trial.

Plaintiff contended that the Weather Clause was so misleading that the rain on the job site was a surprise. It rains an average of 150 inches per year in Palau. It claimed that standard requirements for constructing earthen embankments specified by the Corps were "defective and impossible." The contractor eventually will complete the road according to the specifications it claims were impossible. The Embankment Clause is not defective, and it is not a design specification.

Daewoo's requests for equitable adjustments appear to be based on the difference between the amount plaintiff allegedly thought the job would cost and what it might cost at some time in the future. The contractor hired an expert after having certified and filed its claims. The expert changed Daewoo's method of calculating damages to a "measured mile" approach and reduced the amount of the certified claim by approximately $22 million. In other words, plaintiff asked an expert to review its claim and make recommendations. The expert used a different method of calculating the claim and reduced it by almost one-third. Daewoo did not amend its claims or its complaint, however, or notify the contracting officer of the changes.

We granted plaintiff's request for a rebuttal case after the Government rested. Plaintiff represented that it needed expert assistance from special fraud counsel and forensic accountants for its rebuttal case. We continued trial based on these representations. Plaintiff's rebuttal case months later did nothing to dispel the conclusion at close of trial that Daewoo's claims against the Government were fraudulent.

---

58. Daewoo also declined to put on a rebuttal case at the conclusion of defendant's fraud case. We offered to stay an additional week if necessary for plaintiff's counsel to prepare, but they rejected this proposal as well. Plaintiff's legal team insisted that the only possible cure for the prejudice created by defendant's counterclaims was a continuance; each of plaintiff's four attorneys made this motion repeatedly.

## B. Fraud Statutes

The Contract Disputes Act requires that an authorized corporate official certify that the contractor's claims are "made in good faith." See 41 U.S.C. § 605(c)(1). "The supporting data must be accurate and complete to the best of [the official's] knowledge and belief, [and] the amount requested [must] accurately reflect[ ] the contract adjustment for which the contractor believes the government is liable...." Id.

Congress provided that claims against the United States must be certified by an authorized corporate official, to "discourag[e] the submission of unwarranted contractor claims." S.Rep. No. 1118, 95th Cong., 2d Sess. 5, reprinted in 1978 U.S.C.C.A.N. 5235, 5239, quoted in Transamerica Insur. Corp. v. United States, 973 F.2d 1572, 1579 (Fed. Cir.1992).[59] Plaintiff's Project Manager, Mr. Kim, certified Daewoo's claim. He testified repeatedly that the claim totaled $64 million. He expected the Government to pay the entire amount.[60]

One of Daewoo's problems in trying this case was its legal arguments. Daewoo alleged in effect that it incurred tens of millions of dollars in unexpected costs because a standard weather clause caused plaintiff to ignore all it knew about working in rainy conditions throughout the world. It argued that the Embankment Clause in the contract is a defective design specification and one or both problems made the job "impossible." These are not credible legal arguments.[61]

Plaintiff argues that it is protected from fraud claims by good faith reliance on experts, citing three cases. Two of the cases involve a defendant charged with criminal tax fraud. The third, according to plaintiff's own parenthetical description, "recogniz[es], but reject[s] based on specific facts, the reliance on expert defense to an FCA [False Claims Act] claim." Counsel believes nevertheless that Daewoo is entitled to expert reliance protection "where the evidence demonstrates that Daewoo fully disclosed all relevant information to its experienced claims expert, Exponent, and subsequently relied in good faith on Exponent's advice." Plaintiff did not "disclose[ ] all relevant information" to Exponent, whose experts wanted to distance themselves from anything Mr. Richardson and Mr. Kim put into the certified claim. We did not have confidence in Exponent's "level of expertise."

Daewoo's experts could have performed an important service by checking plaintiff's books and records concerning operating costs and acquisition costs of equipment. They could have found the duplicated and scrapped equipment in the claim, as Mr. Cotton did. See United States v. TDC Mgmt. Corp., 24 F.3d at 292, 298 (D.C.Cir.1994) ("[E]very party filing a claim before the contracting officer and this court has a duty to examine its records to determine what amounts the Government already has paid or whether

---

59. The "horse trading" that plaintiff attempted in this case is one practice that Congress addressed by enacting the Contract Disputes Act, including the requirement that responsible individuals in the company certify its claims. See Transamerica Insur. Corp., 973 F.2d at 1579.

60. Daewoo hired Exponent initially to create a schedule for constructing the road as required by the contract. The consultants remained in Palau to "update" plaintiff's claims using a different method of calculating damages, the measured mile. Mr. Kim knew nothing of the measured mile when he certified the only claim in this case. He did not certify Exponent's work. Exponent did not certify its own work, nor could it have. Plaintiff did not submit a new claim or amend its only certified claim. Daewoo has offered various versions of its total claims, including $64 million, $42 million, $29 million, and $13 million. It has certified only one claim, however, the $64 million claim that it presented to the contracting officer.

61. Daewoo's arguments at times take on a tone of desperation. A post-trial brief includes the following argument:

[T]he Government offered no evidence at trial to prove that Daewoo acted with any intent to deceive. In fact, counsel for the Government acknowledged that, at most, Daewoo's inclusion of duplicate equipment was a mistake. Q. I know it was a mistake [referencing to Daewoo's inclusion of duplicate equipment]. What I'm trying to figure out is whether you know how big a mistake it was. You don't, correct? Cowan Tr. at 16541:1–4 (June 27, 2005).

Government counsel apparently was attempting to test Cowan's memory on cross, or his involvement in drafting the claim. Taking such a question from defendant's cross examination entirely out of context, and using it to argue that defendant's intent was to concede the Government's fraud claims, is a tactic that is difficult to characterize.

payments are actually owed to subcontractors or vendors.... [A] failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard, and a contractor that deliberately ignored false information submitted as part of a claim is liable under the False Claims Act.").

The Government filed counterclaims pursuant to the False Claims Act, the Special Plea in Fraud, and the Contract Disputes Act. Defendant also claimed fraud in the inducement, or "bait and switch," [62] an unusual counterclaim in this context.

### 1. Special Plea in Fraud (Forfeiture)— 28 U.S.C. § 2514

▌ "A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof." 28 U.S.C. § 2514. The Government must prove such a fraud by clear and convincing evidence. *E.g., UMC Elecs. Co. v. United States,* 249 F.3d at 1339. The contractor must knowingly present the false claim with the intention of being paid for it. *Commercial Contractors, Inc. v. United States,* 154 F.3d 1357, 1362 (Fed.Cir. 1998). Mere negligence is not sufficient. *See Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17, 22 (1977). Nor are mere inconsistencies or discrepancies, so long as the contractor can offer a reasonable explanation. *See McCarthy v. United States,* 229 Ct.Cl. 361, 670 F.2d 996, 1004 (Ct.Cl.1982).

The forfeiture counterclaim carries no monetary penalties other than the forfeiture itself. We found no liability against the Government on plaintiff's claim, so Daewoo has nothing to forfeit. Defendant made the necessary showings of intent and otherwise met the elements and the burden called for by this section, however. For example, defendant showed by clear and convincing evidence that the contractor knowingly presented a false claim with the intention of being paid for it.[63] Once these standards and burdens are established, this court must forfeit plaintiff's entire claim. "In such cases, the United States Court of Federal Claims *shall* specifically find such fraud or attempt and render judgment of forfeiture." 28 U.S.C. § 2514 (emphasis added).

### 2. CDA Fraud Statute

The Contract Disputes Act includes a fraud provision:

> If a contractor is unable to support any part of his claim and it is determined that such inability is attributable to misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim in addition to all costs to the Government attributable to the cost of reviewing said part of his claim.

41 U.S.C. § 604.

▌ "Misrepresentation of fact" is defined in the Act as "a false statement of substantive fact, or any conduct which leads to a belief of a substantive fact material to proper understanding of the matter in hand, made with intent to deceive or mislead." 41 U.S.C. § 601(7). The Government's burden is to "show that the contractor made false or fraudulent statements in the claim that was submitted, with intent to deceive or mislead the Government." *Commercial Contractors,* 154 F.3d at 1362.

This statute applies if the contractor has submitted the claim under false pretenses or in an attempt to deceive the Government.

> This subsection is included out of concern that the submission of baseless claims contribute to the so-called horsetrading theory where an amount beyond that which can be legitimately claimed is submitted merely as a negotiating tactic. Hence, payment of such a claim by the Government would constitute a windfall to the contractor.

Senate Report No. 95–1118.

▌ The Federal Circuit observed that "the statute does not prescribe a standard of

---

**62.** Bait and switch claims usually arise in this court in connection with bid protests. Normally, the Government would waive any concerns that it might have had because the winning contractor would be the bidder alleged to have acted improperly. The Government here alleges fraud in the inducement as a counterclaim.

**63.** Evidence of this fact includes the testimony of Mr. J.W. Kim, the corporate official who certified the claim to the contracting officer.

proof [but] the 'preponderance of the evidence' standard has been applied in the past, and we agree that the traditional civil standard is appropriate here." *Commercial Contractors,* 154 F.3d at 1362 (citations omitted). The Government proved by any standard that Daewoo's $64 million claim was fraudulent. Plaintiff made the claim for purposes other than a good faith belief that the Government owed Daewoo that amount. Plaintiff in fact did not believe that the Government owed it $64 million as a matter of right.

The Project Manager testified at one point that Daewoo filed at least $50 million of the claim to indicate "the seriousness of the situation" and to get the Government to "pay attention" so it would agree to a cheaper method of constructing embankments. DX 1009 SL 507 (Notice Letter); Tr. 679–80 (Cowan); Tr. 9544–45, 9549–50, 9575–77 (J.W. Kim). If so, this is further evidence of bad faith. It means that Daewoo submitted a certified claim as a negotiating ploy; that is, for a reason other than an attempt to recover money for which Daewoo believed the Government is liable.[64]

The CDA fraud provision applies "to the extent a contractor increases the claim submission by the fraudulent addition of items or costs or by misrepresenting its claim items or costs." Senate Report No. 95–1118. Congress expressed concern that the statutory penalty permitted by the False Claims Act, the same amount per claim irrespective of the amount, may not be a sufficient deterrent for large claims. Its intent therefore was, "the larger the fraud attempted, the greater is the liability to the Government." *Id.* Daewoo's entire $64 million claim was an attempt to defraud the United States.

3. False Claims Act—31 U.S.C. § 3729

◼ The Government must prove the elements of a cause of action under the False Claims Act by a preponderance of the evidence. See 31 U.S.C. § 3731(c). Defendant must establish that (1) the contractor presented to the United States a claim for payment; (2) the claim was false or fraudulent; (3) the contractor knew the claim was false

or fraudulent; and (4) the United States suffered damages as a result of the false or fraudulent claim. *Young–Montenay, Inc. v. United States,* 15 F.3d at 1043 (quoting *Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17 (1977)).

◼ "Knowledge" includes deliberate ignorance of the truth or reckless disregard of the truth, and in that case no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(3). Daewoo presented a false claim for payment and knowingly used false records or statements to support the claim. The penalty is $10,000 plus three times the amount of damages. 31 U.S.C. § 3729(a)(3).

"Claim" is defined broadly by the statute to include "any request or demand ... for money or property" from the Government. See § 3729(c). Typical examples of false claims in this court are those represented by invoices or similar "claims for payment." Daewoo did not present invoices because the Government made progress payments according to amount of earth moved during a period of time. Because of substantial disagreement regarding the cubic meters of embankment or other earth-moving activities, such as cuts and fills, the Corps had representatives meet with Daewoo employees regularly to agree on such amounts. The Government made progress payments according to these stipulated amounts.

The certified claim itself was false or fraudulent and plaintiff knew that it was false or fraudulent. Whether the United States suffered damages as a result, however, is a matter that we could not establish. *See Commercial Contractors,* 154 F.3d at 1371–72 (permitting statutory penalties under the False Claims Act but not treble damages in absence of actual damages) (citing *United States v. Dyncorp, Inc.,* 136 F.3d 676, 681 (10th Cir.1998) (holding "the government need not prove damages to establish liability under the FCA, but can instead recover statutory penalties for a violation even absent any damages."); *Young–Montenay, Inc. v. United States,* 15 F.3d at 1043;).

---

64. Mr. Kim confirmed that he understood the significance of certifying a claim to the contracting officer. *See Young–Montenay, Inc. v. United States,* 15 F.3d at 1043 (holding that paragraph (3) is met where a corporate official admitted fraud under oath).

#### 4. Fraud in the Inducement— "Bait and Switch"

The Supreme Court ruled in a case from the Court of Claims that the Government could, as a matter of public policy, terminate a prime contractor for default where its subcontractors obtained their jobs by using kickbacks. *See United States v. Acme Process Equip. Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249, (1966). The prime contractor had no knowledge of the kickbacks and was not involved in any illegality. The Court found that the United States nevertheless should be able to rid itself of prime contracts tainted by kickbacks. *Id.* The Court added,

> [E]ven if the Government could isolate and recover the inflation attributable to the kickback, it would still be saddled with a subcontractor who, *having obtained the job other than on merit, is perhaps entirely unreliable in other ways.* This unreliability in turn undermines the security of the prime contractor's performance—a result which the public cannot tolerate....

*Acme Process*, 385 U.S. at 144–45, 87 S.Ct. 350 (emphasis added). The facts of this Supreme Court case are different from ours, but its ruling is significant. The Government was permitted to terminate the prime because of the taint of illegality related to the contract. The Government, and indirectly the American people were not required to be "saddled" with contractors who used illegal means to win their contracts. *Id.* Daewoo is not charged with kickbacks, but it "obtained the job other than on merit." *Id.* As the Court anticipated, the record shows that Daewoo turned out to be "entirely unreliable in other ways." *Id.*[65]

Daewoo submitted its final proposal on January 14, 1999, listing key personnel and subcontractors that it would use to complete the contract requirements. The Solicitation required that Daewoo update its technical proposal where applicable.[66] Daewoo did not disclose the changes it had made concerning key personnel, subcontractors, or sequences and methods of work. PX 109 p. 21, 62, 92–96. Plaintiff argued that it was obliged only to provide the Government with management and subcontractors of "equal or greater value"—not necessarily those disclosed in the final proposal. Tr. 9236–9248, 9354–9369 (J.W. Kim); Tr. 3323, 3366–3367 (Hong). However, the right to make that evaluation was the Government's, not the contractor's. Plaintiff knew what it was doing and why. The Corps gave Daewoo high technical scores on its final proposal; this was a major factor in Daewoo's being awarded the contract. Tr. 6127 (Bowen); Tr. 7268–69, 7275 (Kuioka).[67]

##### i. Mr. Ha

Mr. Ha was an important person to the Corps of Engineers because of his reputation and his previous work. His being named Project Manager was a major plus for Daewoo. Mr. Ha's participation gave plaintiff's bid added credit, luster, and weight.

---

**65.** The Government does not contend that this statute carries additional monetary penalties, but we noted earlier that it may be considered an analog to the Forfeiture Statute discussed above. That is, penalties do not apply where the contractor could not prove damages. Fraud in the inducement, like any fraud, compromises the legitimacy of a transaction. As the Supreme Court observed, it permits a contractor to "obtain[ ] the job other than on merit." *Acme Process*, 385 U.S. at 144–45, 87 S.Ct. 350. We included fraud in the inducement in this section because (1) it shows the lengths to which plaintiff was willing to go in pursuing this contract from the early stages; and (2) defendant proved it.

**66.** The Government instructed Daewoo as follows: "When you submit your final revised proposal, you will have an opportunity to make changes (if any) to your price and technical proposals." PX 87 1–2 (Discussion Questions). Daewoo's final proposal contained a section called "Revisions to Technical Proposal" and included a section for revision to "Key Personnel." PX 109 100, 134 (Final Proposal).

**67.** Paul Bowen and Gordon Kuioka were members of the Corps' Technical Review Panel. Tr. 6121 (Bowen); Tr. 7133–34 (Kuioka). They testified that the Corps' panel was impressed with Daewoo's experience in performing other road projects in tropical and remote locations of the world. Tr. 7248–75 (Kuioka); Tr. 5619–21, 5827–41 (Bowen); DX 1004. The Corps gave Daewoo a high rating based on its view that key personnel listed in Daewoo's proposal would bring experience and knowledge to construction of the road. PX 64 2–10; DX 1004 63; Tr. 5893 (Bowen); Tr. 7264–66 (Kuioka).

Plaintiff knew that Mr. Ha and others would not be on site for this job, and it deceived the Government by not updating the list of personnel accordingly. Defendant's counsel termed this false pretense. We consider it a part of the fraud. It is a simple yet representative example of plaintiff's fraudulent misrepresentations in connection with this contract and it supports the Government's claim of fraud in the inducement. Despite the possibility that it had a comparatively minor impact compared to other problems, this episode shows that from the beginning, plaintiff was willing to be dishonest.

Daewoo purposely avoided disclosing Mr. Ha's unavailability for this job. Considering the elements of misrepresentation, it is uniquely important to this case; it set the stage: (1) Mr. Ha was well known to the Corps of Engineers; (2) he was so highly regarded that the Corps would give Daewoo extra credit in its evaluation for having Mr. Ha on the job; (3) Daewoo knew how the Corps felt about Mr. Ha and that his presence on the job would assist their bid; and (4) Daewoo knew Ha's unavailability would hurt its bid and purposely omitted mentioning it for that reason.

The score sheet used by the Corps of Engineers in deciding on contract award shows how important plaintiff representations were to the Government. *See* DX 1004. The reviews gave Daewoo high scores for assets it did not provide. These included key personnel Daewoo said it would assign to the project. PX 64, p. 64 (Technical Proposal); PX 109, 70–90 (Final Proposal); DX 1004 (Source Selection Board Papers); Tr. 5839–41, 5871–77, 5880–83, 6127 (Bowen); Tr. 7260–66 (Kuioka). Plaintiff also represented that Daewoo would do the earthwork itself and double-shift workers so it could pave concurrently with earthwork.

Daewoo's final proposal listed fourteen "key personnel" as its management for the project on Palau. Only two came. The two who arrived in Palau acted in capacities different from those disclosed in the bid. Tr. 7886–7903 (Morrison).

ii. Daewoo's Subcontractors

Plaintiff was looking for and meeting with subcontractors to perform the earthwork even as it was representing to the Government that it would perform that crucial function itself. Daewoo had accepted bids from OCDC, JungJou, and Putra, none of which plaintiff had disclosed to the Government as potential subcontractors.[68] DX 1022 (OCDC Request for Quotation); Tr. 8634–44, 8842–49 (Yang); Tr. 9816–18 (Calawen); Tr. 9949–50, 10008–09, 10011–12(Lee); Tr. 9250–51 (J.W. Kim).

Plaintiff submitted other subcontractors as "prospective" in its bid papers, along with substantial amounts of information about each. The Source Selection Board presumably wasted much of its time evaluating the wrong companies for Daewoo's bid. The Corps received hundreds of pages of information about potential subcontractors, but nothing about OCDC, Putra, or JungJou, whose workers would attempt to construct the embankments.

iii. Sequence and Methods of Work

The final proposal represented not only that Daewoo would perform the main earthwork itself, but also that it would work double shifts. Double shifts would enable it to do the paving concurrently with the earthwork. Tr. 3300–14, 3318–20 (Hong); PX 109 (Final Proposal). Daewoo's post-award project plans or schedules did not resemble those disclosed in the bid plan, however. It did not conduct asphalt paving and earthwork concurrently, for example, and it did not run double shifts. Tr. 9295–98 (J.W. Kim). We doubt that it ever intended to. *See* Tr. 7622 (Morrison); Tr. 13972, 14011–12 (Mathis); Tr. 3560–85, 3685–87 (Hong).

Daewoo disregarded the sequencing established by its Preliminary Work Program and delayed starting work in the northwest section of the project (Package C) until after completing other areas. This created a significant delay in the project. Tr. 14897–

---

**68.** This representation was another important factor in the high technical score that the evalu-

ators gave to Daewoo's proposal.

14898, 14912 (D'Onofrio). Even before it began working on the embankments, Daewoo's project schedule exceeded the time permitted for completion by the contract. Tr. 14833, 14841–14842 (D'Onofrio); DX 1013, Exhibit # 12 (CPMI report). Daewoo's post-award baseline schedule included seven months of delay due to increases in the time needed for embankment work in all sections, compared to the Preliminary Work Program contained in the Final Proposal. This was partly a result of Daewoo's decrease in planned embankment production from 900 cubic meters per crew per day to 800 cubic meters per day. Tr. 14853 (D'Onofrio); DX 1013 Exhibit F.[69]

Daewoo argued in response to defendant's bait and switch case that the Government waived any rights it had to claim fraud because the Corps knew about the switch. For example, defendant knew that the changes involving management and subcontractors had occurred—once they arrived on site—and did nothing about it. Defendant pointed out that all the Government could do was terminate Daewoo for default, and it has no obligation to terminate early in the process to preserve the Government's rights to claim fraud later.

No additional monetary damages apply, but plaintiff indeed induced the Government fraudulently to award this contract. If plaintiff were entitled to damages, which is not a possibility given the facts of this case, arguably such damages would be forfeited because plaintiff obtained its contract by fraud. In such a manner, fraud in the inducement would be an adjunct to the Special Plea in Fraud. *See* 28 U.S.C. § 2514. The parties did not argue or brief this issue, however, and we do not address it further.

## PLAINTIFF'S REBUTTAL CASE

The response of plaintiff's legal team to the Government's fraud counterclaims was to claim surprise and incompetence. Apparently they had not been listening carefully to their own witnesses.[70] Witnesses admitted that Daewoo filed a certified claim as a negotiating ploy. They were evasive and contrary on the stand, and they offered testimony that they must have known was not true. Plaintiff's counsel could not explain adequately the various amounts of the claim or how it was calculated. They dismissed potentially serious Rule 11 problems with plaintiff's pleadings as being "inartfully drawn." Their experts failed utterly in their duty to assist the court with a reliable, professional report. We could not rely on their reports or their testimony.

### A.

Daewoo's attorneys claimed professional inadequacy in the face of fraud claims, to which they expressed surprise. They moved repeatedly for delays to prepare a rebuttal case. They urged that plaintiff would be impossibly prejudiced if we were to allow the case to end after thirteen weeks. We asked plaintiff to brief the nature of its prejudice, given that the evidence of fraud arose from Daewoo's own witnesses and exhibits. We gave plaintiff's counsel the opportunity to explain why they could not handle such counterclaims, as the evidence was taken from their own case. Such explanations were not clear but plaintiff argued that anything less than adjournment of the trial would result in hopeless prejudice against Daewoo's legal position.[71]

Plaintiff's counsel wanted to return to Washington and present a rebuttal case here, and eventually we agreed. Plaintiff's attor-

---

**69.** Daewoo filed its claim for delay and loss of production based on 1200 meters per crew per day.

**70.** In fact, each attorney seemed to specialize in only a discrete portion of the case; lead counsel stated at one point that he did not know "anything about damages." It is true that counsel were surprised and did not seem to appreciate the fragile nature of their case; it was a mystery that we pondered often during trial. We made an effort to warn plaintiff of the dangers develop-

ing in it case, and to urge that counsel resolve the matter with defendant rather than forcing an Opinion of this nature. Rarely does a case of this magnitude provide evidence of fraud so clearly.

**71.** Three trial counsel for plaintiff represented to the court that they were "not competent" to handle a case containing fraud counterclaims, and that they wished to associate special fraud counsel.

neys represented that they could be ready after arriving home, and would present the rebuttal phase soon thereafter. By then, defendant's counterclaims had been filed for nearly two weeks.

Each of plaintiff's attorneys assured the court repeatedly that they were "not competent" to represent Daewoo now that fraud counterclaims had been filed, so they needed new counsel who specialized in fraud. Daewoo also needed a certified forensic fraud examiner to review the alleged fraud, and they wanted to present fact witnesses to testify regarding Daewoo's "intent." We found all of this far less than convincing. Two members of plaintiff's trial team are highly regarded senior members of a Washington, D.C. law firm that specializes in government contracts. We could not understand the need for additional fact witnesses in the circumstances. Calling some of the same fact witnesses, particularly Mr. Cowan, could be a mistake.[72] We permitted the rebuttal case on plaintiff's terms so long as its counsel assured the court that they would not delay upon return to Washington.

Having obtained a continuance and finding itself safely back in Washington, Daewoo asserted that it would be prejudiced by having to put on its rebuttal case right away as promised, and asked for unlimited time for new discovery related to the fraud counterclaims. Its attorneys represented to the court that Daewoo required a certified fraud examiner to testify in the rebuttal case.[73]

One of Daewoo's own experts is a certified fraud examiner. He was familiar with the case, having testified during trial. Plaintiff argued in essence that ethically this witness, Mr. Allen, could not "review his own work," however. Mr. Allen, the Daewoo expert who had been working on this case for more than a year, swore that he could not testify about errors in Exponent's report. The court needed another certified examiner to provide such expert testimony.

### B.

Plaintiff filed motions to dismiss and for summary judgment on the CDA counterclaim and the Special Plea in Fraud, and filed an answer to the False Claims Act counterclaim. The Government responded to these motions, and we conducted a trial on plaintiff's rebuttal case in June 2005. Plaintiff did not call a certified fraud examiner during its rebuttal case, but recalled Dennis Allen, the Exponent expert whom counsel assured the court could not "review his own work" when we were in Hawaii.

Daewoo associated special fraud counsel but evidently he served only in an advisory role. He did not participate in the rebuttal case except to examine one witness, an accountant. Plaintiff's original legal team, composed of attorneys who in Hawaii considered themselves "not competent" to handle a fraud case, wrote the briefs and made all the legal arguments. They questioned the witnesses.[74] The rebuttal trial was a mistake from plaintiff's standpoint. Its attempts to address the Government's overwhelming evidence of fraud made matters worse.

Plaintiff argued that it is appropriate to "update" a claim with better numbers. This may be true. *See, e.g., UMC Elecs.,* 43 Fed. Cl. 776 (finding that a contractor was guilty of fraud on all counts where he certified updated claims submitted to the Government). No one certified Daewoo's "updated claims." Plaintiff's experts testified that the $29 million claim was not an update in any event, but a "repriced claim." That is, the experts started over with a repriced claim; they developed new numbers using a new method of calculation, the measured mile. *UMC* noted, "[w]hen a contractor claims future costs, the contractor must explain its 'estimating process,' including any 'judgmental factors' applied and 'contingencies.'" *Id.* at 803. That court emphasized, "a contractor

---

**72.** Plaintiff called Mr. Cowan in its rebuttal case.

**73.** Daewoo had presented affidavits from at least two such experts who said they would not be available for the foreseeable future. It was not clear why plaintiff's field of available certified fraud examiners was so limited.

**74.** We have concerns about the behavior of plaintiff's counsel in these respects and others, and expect that they will wish to offer explanations to the court at an appropriate time.

may claim future expenses; however, when a contractor submits a claim that includes future expenses, projected costs should be in good faith and in compliance with the FAR, and identified as not yet incurred." *Id.* (citing 48 C.F.R. § 15.804–6). *See also* 48 C.F.R. § 31.001 (defining "actual costs" and "costs incurred, as distinguished from 'forecasted costs' ").

Plaintiff cites *Tecom* and *J.F. Shea* for the principle that increases or decreases in the amount of a claim need not be recertified "where the essential elements or nature of the previously certified claim remains the same." *Tecom v. United States*, 732 F.2d 935, 937 (Fed.Cir.1984); *J.F. Shea*, 4 Cl.Ct. 46. The *Tecom* court held that an uncertified monetary claim properly considered by the Contracting Officer because it was less than $50,000 at the time, did not have to be recertified when the amount increased to exceed $50,000 by the time it got to court, where the increase was reasonably based on further information. *Tecom*, 732 F.2d at 937. Plaintiff continues, "this court has held that a contractor must only certify 'a claim in the amount it *then* honestly believes is due and that the data furnished *at the time of certification* are accurate and complete to the best of [the contractor's] knowledge and belief.' *J.F. Shea v. United States*, 4 Cl.Ct. at 54 (citation omitted). Daewoo did exactly that."

That did not happen in this case. Plaintiff did not honestly believe that the Government owed it the various amounts stated when it certified the claim. Daewoo raises distinct issues in any event. Defendant has not argued that we have no jurisdiction to hear plaintiff's case, or otherwise questioned whether the second claim is "new" for purposes of the Contract Disputes Act. No one has suggested that the uncertified claim must be returned to the contracting officer for decision. *J.F. Shea* held that the plaintiff in that case "[had] not presented a new claim.... Shea has merely presented additional evidence pertaining to damages springing from that same factual claim. Thus, there is no jurisdictional bar to considering the increased claim...." *J.F. Shea*, 4 Cl.Ct. 46 (citing *Spradlin Corp.* ASBCA No. 23974,

81–2 BCA ¶ 15,423 at 76,430–31, 1981 WL 7163). The court noted:

> as litigation in this court includes pretrial proceedings, including discovery, it must be recognized that additional facts may be developed which could increase or decrease the amount of a claim. It would be most disruptive of normal litigation procedure if any increase in the amount of a claim based upon matters developed in litigation before the court had to be submitted to the contracting officer before the court could continue to a final resolution on the claim. In this circumstance, it has been ruled that, after certification is complete, a contractor is not precluded from changing the amount of the claim or producing additional data in support of increased damages.

*J.F. Shea*, 4 Cl.Ct. at 54 (citing *Newell Clothing Co.*, ASBCA No. 24482, 80–2 BCA ¶ 14,-774 at 72,916, 1980 WL 2896). This case is not about jurisdiction but about fraud. The only certified claim in this case totals nearly $64 million. The issue is whether that claim or any part of it is fraudulent.

Plaintiff states, "[t]he Government argues that a problem exists because—without citation to any law contrary to *J.F. Shea*—Exponent used a different pricing methodology. Evidence at trial established, however, that Exponent's damages analysis more precisely identified causes of delay based on the only day-by-day schedule analysis undertaken by either the Government or Daewoo."

This does not address the problem, of course, even if true. The issue the Government raised was not whether the measured mile is a better approach, but whether it is a different approach. Plaintiff is attempting to reduce its damages exposure by reducing the amount of its claim. Daewoo argues that it did not reduce the claim as a result of Exponent's participation by more than $20 million as the Government had pointed out, but "the claim actually *increased* from $13 million to $29 million as Daewoo incurred additional costs subsequent to submission of the claim and utilized an improved calculation methodology." Plaintiff used an entirely different method of calculating the claim, the measured mile, and its experts testified that they

did not update the claim but "repriced" it. They calculated a new, different claim.

Plaintiff urges that "a contractor is not precluded from changing the amount of the claim or producing additional data in support of increased damages [after certification]. A plaintiff must be precluded, however, from raising any new *claim* before this court which was not previously presented and certified to the contracting officer for decision." Whether Exponent's claim was an increase from $13 million to $29 million or a decrease from $64 million to $42 million, it was "repriced" according to plaintiff's own experts. They disclaimed any knowledge of the certified claim, avoiding any testimony that might suggest they had even seen the numbers. This repriced or updated or new claim was not certified by Mr. Kim or anyone else.

Mr. Kim was the project manager who certified the "real" claim, and his knowledge of the data supporting Exponent's version of the claim was very limited, according to the witness. The only certified claim in this case is the March 29, 2002 claim for $64 million, which no one at Daewoo acknowledges now. They adopt instead Exponent's $29 million or $42 million uncertified "update."

## ADDITIONAL MATTERS

### A. The Complaint

Plaintiff disposes of problems with its inflated claim by asserting, "the alleged errors in Daewoo's claim constitute merely inadvertent or immaterial mistakes." The same information in Daewoo's Complaint is "inartfully drawn." In fact, Daewoo criticizes the Government for "refus[ing] to let the matter go [that is, the inflated claim in the Complaint], and has attempted to capitalize on arguably poor draftsmanship in the Complaint." Thus, plaintiff dismisses the Complaint before this court, certified in accordance with Rule 11 by an officer of this court, as "inartfully drawn," and "confusing," the result merely of "poor draftsmanship." Rule 11 provides that an attorney who signs pleadings and files them in this court certifies that "claims are warranted by existing law, to the

best of the [attorney's] knowledge, information and belief, formed after an inquiry reasonable under the circumstances." Such claims must be "likely to have evidentiary support." *See* RCFC 11.

Plaintiff complains that despite this explanation, the Government "mischaracterize[s] Daewoo's claim as one for $64 million. [T]he evidence clearly demonstrates that Daewoo certified a claim for approximately $13.4 million, with a projection of potential future costs." According to plaintiff's counsel, the "certified claim itself is clear, the confusion on this subject is due in part to the language of the Complaint, even though any such confusion was clarified." Daewoo has not amended its Complaint, however, so counsel thinks that the court should do that now: "[T]o the extent the Complaint may have confused this issue, the Complaint should be deemed amended to conform to the evidence . . . ." (citing RCFC 15(b)). "Fraudulent intent . . . cannot reasonably be inferred from the poorly explained portions of the Complaint (i.e., Paragraph 32 and the Prayer for Relief at the conclusion of the Complaint)."

### B. The Manual

The Corps of Engineers provides a Construction Equipment Ownership and Operating Expense Schedule showing average ownership and operating rates for construction equipment. Its purpose is to supply costs of acquisition or operation in default of better information from a contractor's books and records. Using the Manual is improper, however, where its purpose is to inflate the amount of a claim. That happened here.

Defendant showed that Daewoo had equipment acquisition and maintenance costs in its records, but no one chose to compare the records with the Manual to see if the acquisition costs were less than those set out in the manual. If they did, they discovered that the manual rates were higher and ignored the records. In other words, plaintiff purposely avoided looking at its own acquisition costs in favor of the higher manual numbers. This intentional inflation of the claim is fraud.[75] Daewoo also applied the manual

---

75. Use of the Manual is not per se improper. Daewoo could have used the schedule for either

the acquisition or operating expense if actual costs were unavailable. The Manual's use would

rates improperly and inconsistently.[76]

It should be difficult for plaintiff to argue that it did not know to use actual acquisition and operation costs if it had them, or that it thought the contract required use of the Manual.[77] Common sense suggests that businesses should use numbers available to them in favor of manuals showing industry averages. Moreover, the Manual itself instructs contractors to use actual costs when available.[78]

Daewoo's choice of manual rates over actual costs created an inflated claim, as rates used in the Manual are generally higher than actual costs. The Government does not encourage the use of manual rates because contractors would be tempted to avoid recording actual costs. Such a practice has the effect of inflating claims, but it results in bad business practice as well.

Plaintiff's experts did not verify or question inconsistencies in the information provided by its client, Daewoo.[79] For example, Exponent used the incorrect production rate of 1200 cubic meters per crew per day to calculate Daewoo's claim. Plaintiff bid on

the basis of 900 cubic meters of earthwork per crew per day. It used the Corps' manual or book rate for all acquisition costs of machinery and equipment when actual costs were readily available and far lower. Exponent corrected its errors only after government experts pointed them out. Some of the corrections were made during trial, in one case on the morning of the experts' testimony. None of Exponent's errors explained in the Cotton Report reduced the amount of plaintiff's claim; all had the effect of increasing the claim.

Plaintiff included scrapped equipment in the claim and equipment that had been depreciated beyond its cost. Daewoo generally applies a four-year depreciation system for its equipment. Some of the equipment had been fully depreciated before the Compact Road Project began. Daewoo inflated the number of hours used daily on certain equipment, including a Jeep used by the Project Manager. Daewoo's claim states that Mr. Kim used his Jeep forty hours per week, calling for him to drive around the job site eight hours per weekday.[80]

---

have been proper for equipment that lacked records. Plaintiff could have used the Manual for operating expense and used actual records for acquisition. It was not necessary to use all-Manual or all-actual costs. Plaintiff did not consider its records because the Manual rates were higher.

76. Exponent adjusted rates based on the age of its equipment and in some cases adjusted for equipment used beyond a standard forty-hour week. It did not adjust rates for changes in the cost-of-money rate or changes in fuel and maintenance costs, however.

77. Plaintiff's justification for arguing the Manual was required by contract is, needless to say, selective. Use of the Manual in connection with the Coral Dredging delay claim was understandable, as Daewoo had not yet mobilized fully.

78. See, e.g., 48 C.F.R. § 31.105(d)(2)(I):

(i) Allowable ownership and operating costs shall be determined as follows:
(A) Actual cost data shall be used when such data can be determined for both ownership and operating costs for each piece of equipment, or groups of similar serial or series equipment, from the contractor's accounting records. When such costs cannot be so determined, the contracting agency may specify the use of a

particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment. . . . (emphasis added).

79. If Exponent had made such an inquiry, and we assume it was not complicit in plaintiff's fraud, Daewoo's experts could have performed an important service by checking plaintiff's books and records concerning operating costs and acquisition costs of equipment. They could have found the duplicated and scrapped equipment in the claim, as Cotton did. See TDC Mgmt. Corp., 24 F.3d at 292, 298 ("[A] failure to make a minimal examination of records constitutes deliberate ignorance or reckless disregard, and a contractor that deliberately ignored false information submitted as part of a claim is liable under the False Claims Act.").

80. Some of the sources for these and other errors are in the Cotton Report (DX 1015); they may be summarized as: Overstated costs—e.g., Exponent applied a $121 per month standby rate for plaintiff's use of a Skil Saw. PX 304, 255–392 (Certified Claim); PX 252, (Indirect Overhead); Tr. 10427–31 (Song); Tr. 13240–45, 13405–07 (Allen). Depreciating vehicles beyond original acquisition costs—Nissan pathfinder (PX 304, 264–392) (Certified Claim); DX 1015 18–20 (Cotton Supplemental Report); Tr. 13389–13405 (Allen). Claiming costs for scrapped and duplicated equip-

Exponent did not always use manual rates that applied to equipment used in the claim. It should have used the rates for 1999 and 2000. Instead, plaintiff used rates for 2003 for some of its claim. This inflated plaintiff's claim.[81]

We noted that all Daewoo's "errors" in the claim increased the amount of the claim; no errors had the effect of reducing the claim. This would be a remarkable coincidence in a random review of claim elements, or any means of "sampling" by auditors. *See, e.g.,* DX 1015 (Cotton Report); DX 1015 (Cotton Supplemental Report); Tr. 17303 (McGeehin). The possibility that the inflationary effects of Exponent's and Daewoo's errors resulted from innocent mistakes is remote.

Instead of determining actual equipment costs and using these costs in the claim calculations, Exponent used equipment rates contained in the 1999 and 2001 editions of the Manual. Both editions state:

> This pamphlet applies to all USACE commands. It is applicable to all Solicitations and contracts for construction expected to exceed the Simplified Acquisition Threshold of $100,000 *when actual costs data for both ownership and operating costs cannot be determined.* ... [T]he use of this pamphlet will be required by contractors for pricing contractor owned equipment in negotiated procurement when: (1) Cost or pricing data as defined in FAR Part 15 is not required. (2) *Cost or pricing is required and the actual costs data to support either ownership or operating costs*

> *for equipment or equipment groups of similar model and series is not available.*

EP 1111–1–8, Construction Equipment Ownership and Operating Expense Schedule, Region XII (Kwajalein Island) (emphasis added).

Daewoo's subcontractors provided actual equipment costs to the Government. Many of the unallowable and unsupported costs included in Daewoo's claim had been identified and removed by DCAA in an earlier claim, but were added again to this claim. Re-claiming costs that were rejected in an earlier claim as unallowable is further evidence of bad faith.

C.

Congress passed the Contract Disputes Act in part to encourage bidders on government contracts to submit reasonable and responsible proposals in response to invitations for bid. A contractor's completing the project and making a profit serves the interests of both parties. Other rationales of the Contract Disputes Act are a reasonable hope of quality work on the job, and simple fairness. This case shows that an important function of the Act is to insure fairness not only to the Government, but also to other bidders.

Other bidders on this job did their homework, made reasonable offers, and perhaps could have finished the job on time without the need for litigation. They did not have the opportunity to try. They recognized the difficulties of producing a road fifty-three miles long on a tropical island with mountain-

---

ment—DX 1015 (Cotton report); Tr. 15250, 15253–15255, 15274–15275, 15279, 15282, 15285–15286, 15290, 15293, 15296–15298, 15300–15301, 15303–15306, 15316, 17498–17499, 17501, 17509, 17522–17526, 17532–17535 (Cotton); DX 1015 (Cotton Supplemental Report). *Claiming unallowable items—e.g.,* interest costs and entertainment costs—DX 1015 (Cotton Report); DX 1015 (Cotton Supplemental Report); Tr. 17561–62 (Hadley).

81. Plaintiff used the Manual inconsistently. Exponent chose manual rates based on the 2001 Schedule for the "measured mile" inefficiency claim, and it used the 1999 and 2001 Schedules (inconsistently) for the disruption portion of the claim. Exponent admitted that it did not use the rate schedules consistently. Its report states "in general the subset B equipment [2002 and 2003

direct costs] is from the 2001 book and the subset A equipment [2000 and 2001 direct equipment and 2002 and 2003 indirect equipment] is from the 1999 book. A few items in subset A have been priced copying the rates from 2001." Exponent's Report states, "in our work, the subset A equipment was identified by Daewoo. The subset B used essentially the same descriptions and was ID'd by Exponent, reaching different rates in some cases. For those pieces with vastly different rates, we requested Daewoo to relook at the piece and the Corps book to confirm the Corps' ID which was closest to the actual piece of equipment.... As was expected, in some cases, Daewoo confirmed our ID, in some cases, their ID, and in some cases chose a new ID. Though we were able to incorporate the changes into the subset B equipment, we estimated some subset A equipment using the subset B rates."

ous terrain and persistent rain. Their pre-bid studies showed that soils on the island would not compact easily, and they added the costs of supplemental materials to assist their efforts. In short, they knew that it was an expensive job and they bid accordingly.

The Government had urged contractors in the bidding process to exercise "creativity and flexibility" in meeting the difficult time and climate restrictions they would find on Palau. Some bidders would have used blended rock to address the compaction problem, an expensive alternative. Others proposed using lime, or scrapers. Plaintiff did not attempt any of these methods. Only Daewoo thought that it could accomplish required compaction by what was referred to during trial as a "dig and dump method." That is, plaintiff thought that it could simply pick up the dirt and dump it on the embankments.[82]

Responsible bidders lost the Palau contract to Daewoo because of their prudence.[83] It may not be a coincidence that plaintiff is seeking equitable adjustments in this litigation that approximate the amount by which Daewoo was able to undercut more careful bidders.

## D.

Plaintiff responded to the Government's concern about its low bid by acknowledging that the bid was unrealistic because, "in reality [the contract] cannot be achieved [at the bid price] due to the amount of time required for drying/aerating, the cohesive soils, settlement criteria for embankment construction, and the constant threat of rainfall virtually every month of the year." This shows that Daewoo knew as well as everyone else how difficult this job would be.[84] It focused at

82. Plaintiff's counsel commented during his opening statement, "this moving of the dirt, spreading it out, mixing it up, and running over it with a roller to get compacting is not rocket science. It's something that this contractor, its subcontractors, and virtually every other road building subcontractor in the world does day in/day out."

This may explain Daewoo's attitude in preparing its bid and planning the job once it was awarded the contract. Other contractors understood how difficult this job would be, and bid accordingly.

83. Daewoo emphasized repeatedly how difficult this project was because of the technical aspects and other problems, such as weather. Such arguments only explain many of the comments of other bidders concerning the difficulty of the job and the extent to which plaintiff underbid the contract. Plaintiff knew or should have known when it bid the contract that this would be an extremely difficult project.

84. If that were not sufficient, the Government's designers and geotechnical advisors warned of difficult conditions to anyone who would bid on this project. Geolabs issued final Geotechnical Engineering Reports for each of the Packages in July 1998. The Executive Summary for each of the four geotechnical reports contained the following disclosure:

Due to the high in-situ moisture content of the on-site soils, substantial aeration of the high moisture soils will be required in order to achieve the normal 90 percent compaction requirement and may not be feasible due to the year-round high rainfall experienced at the project site. As a result, the compaction requirements for general fill placement will have to be reduced in order to aid in the earthwork construction using the high moisture content tropical soils in this wet environment. Based on our engineering analyses, we believe that a compaction requirement of a minimum 85 percent relative compaction may be used for this project.

Our laboratory test results indicate that the in-situ saprolite soils or compacted fills composed of the same materials generally exhibit relatively low CBR values in a very moist to wet condition. Strengthening of these subgrade soils with the inclusion of additives, such as lime treatment, and/or the incorporation of ground stabilization fabrics at the subgrade level, may be required prior to pavement construction and/or to facilitate earthwork construction with the very high moisture soils.

The Geotechnical Reports also included "Fill Placement and Compaction Requirements":

Since the project site is located in a high rainfall area and the on-site materials generally have high in-situ moisture contents ranging from about 50 to over 80 percent, which is approximately 20 to 50 percent above the optimum moisture content, significant drying of the excavated materials will be required prior to their use as fill and/or backfill material in order to meet the normal 90 percent minimum compaction requirement.

As mentioned earlier, substantial aeration of the in-situ soils may not be feasible due to the high rainfall environment at the project site. Based on past project experience in Palau and our experience with similar high moisture tropical soils, we believe the compaction requirement for general fill placement for this project may be reduced from the standard 90 percent to a minimum of 85 percent relative compaction.

the beginning on the same issues that it would complain of later. Plaintiff's complaints about the weather and the soils of Palau therefore rang hollow.

### E.

Daewoo complained that the Government and its experts picked out small issues that did not make much difference in the bottom line. These minor differences added up, however, and they showed that plaintiff was willing to commit fraud. Plaintiff was willing to inflate its claim wherever and whenever it could, even in amounts that were relatively small. *See, e.g.*, Cotton Report, p. 20: "Exponent rounded the percentage-to-completion factor from 44.453% *upward* to 45%. That rounding error alone results in a claim overstatement of approximately $131,000."

Exponent added unallowable and unsupported costs in the claim. These included alcohol, donations to Palau, and entertainment, for example. Daewoo also claimed interest on its letter of credit. Costs of financing are not allowable. *See* 48 C.F.R § 31.205–20. Daewoo claimed financing costs of more than $12,000 in the certified claim.

### DAMAGES

Daewoo did not prove liability. Plaintiff's claim is fraudulent. The issue with regard to damages is how to measure plaintiff's fraud. The Contract Disputes Act fraud provision states, "[i]f a contractor is unable to support any part of his claim ... [because of] misrepresentation of fact or fraud on the part of the contractor, he shall be liable to the Government for an amount equal to such unsupported part of the claim." 41 U.S.C. § 604.

The "part of [the] claim" that is fraudulent without question is $50,629,855.88. Plaintiff's

authorized official certified this claim and presented it to the contracting officer as costs "to be incurred after December 31, 2001." The certifying official, Mr. Kim, testified that he submitted the claim to get the Government's attention. He wanted the Corps to know how much it would cost the Government if Mr. Morrison did not approve the new compaction method that plaintiff preferred. Plaintiff's counsel acknowledged that Daewoo's purpose was to insure that the Corps would approve the new method sooner rather than later. "Daewoo's suggestion that the Government expedite a previously approved and validated alternative embankment placement method is a reasonable request that served the projects best interests...." Daewoo used a certified claim to "suggest" that the Government change the method of compaction required by the contract that plaintiff bid on and won, to save plaintiff money.

Plaintiff attempted during trial to show that the claim was some lesser amount, apparently sensing this outcome. Daewoo did not certify a lesser amount to the contracting officer, however; the Government observed that Daewoo could not "cure" a fraudulent claim in any event. After the contracting officer denied plaintiff's claim, Daewoo filed a complaint in this court seeking the entire $64 million. The contracting officer's denial of that claim is the basis for our jurisdiction.

Daewoo swears in the certified claim that defendant owes $13,348,793.07 for its added costs caused by the Government through December 31, 2001, "*and* costs to be incurred after December 31, 2001 in the amount of $50,629,855.88, for a *total monetary damage claim* of $63,798,648.95." *See* Complaint ¶ 32.[85] (emphasis added). We suspect that Daewoo's entire claim is fraudu-

---

. . .
Even with the reduced 85 percent minimum compaction criteria, we believe that some moisture reduction would still be necessary, especially for the materials generated from the deep excavations where the in-situ moisture contents may be in excess of 65 to 70 percent.

**85.** Paragraph 32 of the complaint recites the damages included in its March 29, 2002 certified claim to the contracting officer. The complaint effectively incorporates the claim by reference, describing the claim as having "requested dam-

ages for the added costs incurred from October 13, 2000 through December 31, 2001, in the amount of $13,348,793.07 and for the added costs incurred and to be incurred after December 31, 2001, in the amount of $50,629,855.88, for a total monetary damage claim of $63,798,648.95." Daewoo's claim also included a request for an additional 928 calendar days to complete the contract work "resulting from delays beyond Daewoo's control and without its fault or negligence."

lent. However, plaintiff's apparent incompetence in putting together its claim, along with the unwillingness of its witnesses to explain the process, provides it an ironic benefit. That is, we found it difficult to locate the line between fraud and mere failure of proof in this case.

It is theoretically possible that plaintiff's $13 million claim represents an amount that it could have incurred because of defective specifications, had such a theory been applicable, but plaintiff could not prove it because it employed the wrong legal theories and its witnesses were not credible. For these reasons, we limited findings of fraud to the $50 million claim that clearly is fraudulent.

Witnesses including Mr. Kim testified that the extra $50 million claim was a means to get the Government's attention, and to show the Government what would happen if it did not approve the new compaction method that plaintiff wanted. Daewoo did not file that part of the claim in good faith; it was not an amount to which plaintiff honestly believed it was entitled. Whether Daewoo wanted the money or wanted the Government's attention, $64 million was not an amount the Government owed plaintiff at the time of certification, and plaintiff knew it.

## CONCLUSION

Daewoo violated the False Claims Act by knowingly submitting false or fraudulent claims; it violated the Contract Disputes Act through its submission of false or fraudulent claims with an intent to deceive or mislead the government; and it attempted to practice fraud against the United States "in the proof, statement, establishment, or allowance" of its claims. 28 U.S.C. § 2514. These findings are supported by testimony of plaintiff's witnesses and other evidence produced by plaintiff and defendant. Plaintiff's claim to the contracting officer and its complaint in this court sought a "total monetary damage claim" of $64 million, an amount that Daewoo's own witnesses, experts, and attorneys abandoned before the trial was over.

The Cotton Company Report and defendant's examinations of plaintiff's witnesses together are sufficient to establish plaintiff's fraud. Testimony of Mr. Richardson, Mr. Cowen, Mr. Stone, Mr. Kim, plaintiff's experts, and others show that plaintiff filed its claim in bad faith. The Government's examinations of these witnesses was patient and fair, yet their testimony was evasive and nonresponsive, contradictory, confusing, and untrue.

Daewoo's arguments regarding the Weather Clause and the embankment work and its testimony regarding compaction problems and its calculation of the bid, spotlight plaintiff's attempt to accomplish the improper result that Congress addressed by enacting the certification and fraud sections of the Contract Disputes Act. Plaintiff's plan to win the contract with an unrealistically low bid, then profit through demands for equitable adjustments is not necessarily fraudulent *per se*, within the meaning of the statutes included here. By its bidding scheme, however, plaintiff was successful in shutting out legitimate contractors that likely could have handled this job as the Corps of Engineers planned it.[86]

Plaintiff's inability or lack of interest in completing this job properly was evident throughout contract performance. Plaintiff cannot blame the Government for its failures, but only itself and its subcontractors. The Corps' lenient approach in response to the contractor's demands apparently was a hope to salvage the project within a reasonable time. The Government made every accommodation.

Daewoo obtained this contract under false pretenses, though we have not attempted to assign damages to the Government's claim of fraud in the inducement. It submitted false records and made false statements in preparing, certifying, and pursuing its claim and subsequent "updates." Defendant lists a number of instances in which plaintiff made false statements to the Government to further its ambitions or to obtain money or property ultimately. Some are related to the

---

86. We recognize that these and other conclusions are harsh, but evidence to support them is manifest in the record. We urged plaintiff repeatedly before and after trial to resolve this matter and avoid this result, because the likelihood of this outcome was apparent then.

Bait and Switch tactics discussed above. Others include the following:

Alleging compaction requirements were "impossible" when plaintiff's own records showed otherwise; alleging the earthwork could not be done in the time allotted when a subcontractor had been successful doing it; using 1200 cubic meters as its bid-based production number when the truth was available within its operations; over-stating the "cost of more than 700 items of equipment in its claim [and] 27 items of scrapped equipment; and using the certified claim as a negotiating ploy..

We agree that these are "false claims"in the sense that they are untrue and Daewoo knew or should have known better. Whether they are separate claims for purposes of the $10,000 statutory penalty under the False Claims Act is less certain. Some seem duplicative of or encompassed by other penalties, though this would not necessarily be disqualifying. The fraud statutes are cumulative and not in the alternative. The definition of "claim" in the False Claims Act is broad. See § 3729(c) (defining "claim" as "any request or demand ... for money or property' from the Government."). These claims would add $7,620,000 to the damages, at $10,000 per claim. The parties have not briefed or argued this issue; for that reason we decline to enter judgment based on multiple counts at this time.

Daewoo filed at least $50 million of the claim in bad faith. We enter judgment and costs for defendant pursuant to the Contract Disputes Act, based on that amount. *See* 41 U.S.C. § 604. *Defendant's costs related to the CDA counterclaim were estimated to be $4,000,000 near the end of trial. We granted a motion to compel during trial, which mandates costs of less than $2,000.*[87]

Plaintiff's motions to dismiss and for summary judgment on the Contract Disputes Act counterclaim and the Special Plea in Fraud are DENIED. We enter judgment for defendant on its counterclaims pursuant to the Contract Disputes Act, the Special Plea in Fraud, and the False Claims Act as follows:

87. Costs authorized by the Contract Disputes Act and sanctions are subject to accounting. Counsel will confer and advise the court as soon as

Contract Disputes Act—$50,629,855.88.

False Claims Act—$10,000.

Special Plea in Fraud—No monetary judgement.

There being no just reason for delay, the Clerk of Court will enter partial final judgment according to RCFC 54(b) for defendant in the amount of $50,639,855.88, plus interest as applicable. Costs to defendant.

possible but no later than October 23, 2006 whether they will stipulate an additional judgment on such costs.